Contains confidential information subject to protective order

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DENNIS E. MURRAY, SR., and | ) | |
| DPM, Ltd., | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:03-cv-1701 LJM-JMS |
| | ) | |
| CONSECO, INC., and | ) | |
| CONSECO SERVICES, LLC, | ) | |
| Defendants. | ) | |
| ————————————————— | ) | |
| | ) | |
| CONSECO, INC. | ) | |
| Counterclaim Plaintiff/ | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DENNIS E. MURRAY, SR., | ) | |
| DPM, Ltd., and MARGARET MURRAY | ) | |
| | ) | |
| Counterclaim Defendants/ | ) | |
| Third-Party Defendant. | ) | |
| ————————————————— | ) | |

**EXPERT REPORT
OF
LOUIS G. DUDNEY, CPA**

**September 12, 2008**

Contains confidential information subject to protective order

## Table of Contents

I. Introduction ........................................................................................................... 3

II. Qualifications ........................................................................................................ 3

III. Background ........................................................................................................... 5

IV. Summary of Opinions ........................................................................................... 7

V. Damages Analysis ................................................................................................. 9

VI. Fraudulent Conveyance Analysis ....................................................................... 10

    A. DEM Sr. Solvency ......................................................................................... 11
    B. DPM Solvency ............................................................................................... 15
    C. Transactions and Reasonably Equivalent Value – DEM Sr. ........................ 17

VII. Compensation ..................................................................................................... 27

VIII. Additional Analysis and Demonstrative Aids ..................................................... 27

Contains confidential information subject to protective order

## I.      Introduction

This report contains my opinions in the matter of Dennis E. Murray, Sr. ("DEM Sr.") and DPM, Ltd. ("DPM") (collectively "Plaintiffs") versus Conseco, Inc. ("Conseco" or the "Company") and Conseco Services, LLC ("Conseco Services") (collectively "Defendants"). I have been retained to (1) quantify damages incurred by Conseco and Conseco Services, (2) identify and analyze transfers made by DEM Sr. over time, (3) determine if DEM Sr. became insolvent as a result of or was insolvent on the date of each transfer, and (4) determine if DEM Sr. received reasonably equivalent value for the asset(s) transferred and/or the liability(s) assumed.

In addition, I have been retained to (1) identify and analyze transfers made by DPM over time, (2) determine if DPM became insolvent as a result of or was insolvent on the date of each transfer, and (3) determine if DPM received reasonably equivalent value for the asset(s) transferred and/or the liability(s) assumed.

## II.     Qualifications

I am a Managing Director in the professional services firm AlixPartners, LLP ("AlixPartners").  My professional experience covers broad types of litigation, valuation, bankruptcy and management consulting engagements, including breach of contract and lost profits analysis, intellectual property valuation and dispute resolution, solvency determinations, creditor advisory, debtor advisory, insurance dispute resolution, environmental claim analysis, and accounting malpractice and pronouncements misapplication.

I have consulted with companies in a number of industries including, but not limited to, professional services, insurance, specialty chemicals, real estate, financial services, entertainment, telecommunications, manufacturing, construction, energy, and consumer products.  In performing engagements in these industries, I have analyzed economic, financial and accounting issues and testified in Federal Civil and Bankruptcy Courts, State Courts as

Contains confidential information subject to protective order

well as American Arbitration Association hearings and state regulatory proceedings as an expert witness.

Prior to joining AlixPartners, I was a Partner in the Financial Advisory Services Group of PricewaterhouseCoopers.  I hold a Bachelor of Business Administration with a major in accounting from the College of William & Mary and am a Certified Public Accountant.  I am a member of the Illinois Society of Certified Public Accountants, the American Institute of Certified Public Accountants, the American Bankruptcy Institute, and the Licensing Executives Society.

The opinions presented in this report are based on my analysis of the available information and my experience, education, and expertise as a financial consultant.

As part of performing my analysis, I utilized a team of professionals who worked under my direction and control.  The opinions expressed herein are subject to change based upon any additional discovery related to this case or information that I may receive after the date of this report.

I understand fact discovery in this matter is ongoing; therefore, I will update this report, as appropriate, based upon any additional information provided.  Further, I understand from counsel that the Defendants are seeking additional fact discovery including discovery regarding Margaret A. Murray's, DEM Sr.'s wife, financial condition and DEM Sr.'s retirement assets.  In addition, I understand that discovery regarding Murray & Murray Co., L.P.A. and certain charitable foundations has not been permitted to date.  Should information regarding these entities be produced, I will update and amend this report, as appropriate, based upon additional information that becomes available.

Contains confidential information subject to protective order

### III.    Background

DEM Sr. is a former member of Conseco's Board of Directors and its audit committee.[1]   In addition, DEM Sr. is a partner and certified public accountant at the law firm Murray & Murray Co., L.P.A. ("Murray & Murray") located in Sandusky, Ohio.[2]   DEM Sr. has been married to Margaret A. Murray ("MAM", collectively the "Murrays"), for 47 years and has five children and 11 grandchildren.[3]

In the spring of 1997, DEM Sr. and MAM formed an Ohio limited partnership named DPM Ltd. ("DPM").[4]   The purpose of DPM was to acquire, own, sell or otherwise dispose of investment property contributed to DPM.[5]   At the time of DPM's formation, DEM Sr. and MAM were its general partners[6] as well as two of its limited partners.[7]   In addition to DEM Sr. and MAM, the Murrays five children were also limited partners of DPM.[8]

Between 1996 and 1999, Conseco established a loan program which consisted of four tranches whereby Conseco's directors and officers (1) borrowed significant sums of money ("D&O Liabilities"), (2) purchased Conseco stock in the open market ("D&O Assets"), and (3) were required to provide the purchased Conseco stock to the lender banks as collateral to secure the loans.  In addition to the stock collateral, Conseco provided a corporate guaranty to the banks for the loans created as a result of the Director & Officer Loan Program ("D&O Loan Program").

---

[1]  Deposition of Dennis E. Murray, Sr., pages 24 – 26.
[2]  http://www.murrayandmurray.com/Bio/DennisMurray1.asp
[3]  Deposition of Margaret A. Murray, pages 11 - 14. The Murray's children are Dennis E. Murray, Jr. who is married to Martha Murray with four children, Elizabeth Newman who is married to Mark Newman with two children, Charles Murray who is married to Michele Murray with three children, Florence Jesrani who is married to Preet Jesrani with two children, and Margaret M. Murray who is not married and does not have children. (Deposition of Margaret A. Murray, pages 12 - 15.)
[4]  Certificate of Limited Partnership (MM012725 – MM012728).  DPM's partnership agreement was dated March 13, 1997; however, DPM received its partnership certificate from the Ohio Secretary of State on April 22, 1997 (OBR000044).  I understand that there is a dispute between the parties regarding the exact formation date.
[5]  DPM, Ltd.  Partnership Agreement (MM018911)
[6]  I understand that there is a dispute between the parties regarding if and when MAM resigned as a general partner from DPM.  For purposes of my solvency analysis of DEM Sr., I have conservatively included MAM as a general partner.
[7]  Certificate of Limited Partnership (MM012725 – MM012728)
[8]  Certificate of Limited Partnership (MM012725 – MM012728)

Contains confidential information subject to protective order

As a former member of Conseco's Board of Directors, DEM Sr., individually, and through DPM, participated in the D&O Loan Program.[9]   As a result of their participation, DEM Sr. and DPM, separately and together, incurred significant principal obligations ("Notes").[10]   In addition, Conseco Services paid interest due on the Notes through July 31, 2002 to the banks on DEM Sr. and DPM's behalf, giving rise to additional debt obligations ("Services Notes").[11]

During the first two years of the D&O Loan Program, Conseco's stock price rose significantly increasing the net worth of the program participants.  In fact on April 6, 1998, Conseco's stock price reached an all-time high of $57.75 per share.[12]   However, from April 1998 through December 17, 2002[13], the date Conseco filed for bankruptcy, the stock price declined significantly resulting in a substantial liability for each of the participants.  As a result of Conseco's bankruptcy, the D&O Loan Program lenders called upon Conseco to satisfy its guarantees under the D&O Liabilities.  As part of the Company's bankruptcy plan of reorganization, the guarantees that Conseco provided to the lenders were satisfied and Conseco was assigned the respective obligations owed under the D&O Loan Program.  I understand that DEM Sr. and DPM defaulted on their D&O Liabilities by failing to repay these obligations when they came due.[14]

---

[9]  DEM Sr. provided a personal guaranty related to DPM's Services Notes.  (Unconditional Guarantee MM001492).  In addition, DEM Sr. "agreed to indemnify Conseco against, and hold it harmless from, any losses (including reasonable legal fees and expenses) for or on account of or arising from or in connection with or otherwise with respect to Conseco's guaranty of loans to DPM, Ltd" (MM001797, MM002265).

[10]  Katz Sapper & Miller quarterly statements for the Conseco, Inc. Director, Officer, and Key Employee Stock Purchase Plans (C 73755)

[11]  In addition, Conseco Services paid agency fees in September 2002 related to the D&O Liabilities.

[12]  Conseco's high stock price is based on the split adjusted price from the date of Conseco's IPO. Per Bloomberg.

[13]  Conseco, Inc. 8-K dated December 17, 2002

[14]  Credit Agreement dated November 22, 2000, Section 10.1.1, 10.1.2, Section 10.2 (MM002670 - MM002673).  I understand the loan documents associated with the D&O Liabilities contained various default provisions including the bankruptcy filing of Conseco, which occurred on December 17, 2002.  I understand that upon default, the underlying obligations were automatically accelerated and due.  I also understand that DEM Sr. and DPM are disputing the Notes and Services Notes as obligations.  For purposes of this analysis, I assume that these obligations are valid and enforceable.

Contains confidential information subject to protective order

## IV.   Summary of Opinions

- Conseco's damages related to DEM Sr.'s Notes as of the date of this report are $77.2 million plus reasonable attorneys' fees and costs of collection.
- Conseco Services' damages related to DEM Sr.'s Services Notes as of the date of this report are $22.0 million plus reasonable attorneys' fees and costs of collection.

Table 1 below contains a summary of the damages owed by DEM Sr. to Conseco and Conseco Services as of the date of this report.[15]

| Table 1: Summary of DEM Sr. Damages as of 09/12/08 | | | |
|---|---|---|---|
| | Principal[1] | Accrued Interest | Total Damages[2] |
| Conseco | $41,618,499 | $35,532,284 | $77,150,783 |
| Conseco Services [3] | $11,752,096 | $10,275,160 | $22,027,256 |

1. Principal balances are as of June 30, 2002.
2. I understand that once quantified, reasonable attorneys' fees and costs of collection will be added to these amounts.
3. Conseco Services Principal includes interest payment made in July 2002 and agency fees paid in September 2002.

* * * * * *

- Conseco's damages related to DPM's Notes as of the date of this report are $107.5 million plus reasonable attorneys' fees and costs of collection.
- Conseco Services' damages related to DPM's Services Notes as of the date of this report are $31.5 million plus reasonable attorneys' fees and costs of collection.

Table 2 below contains a summary of the damages owed by DPM to Conseco and Conseco Services as of the date of this report.

---

[15] These damages reflect the amounts owed without consideration of DEM Sr.'s personal guaranty of DPM's D&O Liabilities.

Contains confidential information subject to protective order

| Table 2: Summary of DPM Ltd. Damages as of 09/12/08 | | | |
| --- | --- | --- | --- |
| | Principal[1] | Accrued Interest | Total Damages[2] |
| Conseco | $58,002,107 | $49,519,982 | $107,522,088 |
| Conseco Services [3] | $16,791,230 | $14,680,760 | $31,471,990 |

1. Principal balances are as of June 30, 2002.
2. I understand that once quantified, reasonable attorneys' fees and costs of collection will be added to these amounts.
3. Conseco Services Principal includes interest payment made in July 2002 and agency fees paid in September 2002.

\* \* \* \* \* \*

- DEM Sr. became insolvent no later than September 30, 1999 and has remained insolvent through the date of this report.

- DEM Sr. did not receive reasonably equivalent value for numerous transfers he made to MAM; the Dennis E. Murray Irrevocable Trust dated September 6, 2000; the Margaret A. Murray Trust No. 2; the DPM, Ltd. Defined Pension Benefit and Trust; and the 401(k) Retirement Plan of Murray & Murray Co., L.P.A.

Table 3 provides a list of transfers that occurred on or after September 30, 1999[16] for which DEM Sr. did not receive reasonably equivalent value.  Note that there are additional transfers which may be fraudulent that are discussed in this report but which have not been included in this table since insufficient information has been produced to allow the transfer to be quantified.

| Table 3: Summary of DEM Sr.'s Fraudulent Transfers | | | | | |
| --- | --- | --- | --- | --- | --- |
| Transfer | Transfer Date | Transferor | Transferee | Transfer Amount | Prejudgment Interest | Total |
| Murray & Murray Ownership Distributions | Various Dates | DEM Sr. | MAM Trust No. 2 & DEM Sr. Irrev Trust | $ 1,961,857 | $878,634 | $2,840,491 |
| 7,360 Leucadia shares and 37,548 First Citizens Banc shares | Various Dates | DEM Sr. | DEM Sr. Irrev Trust | $999,680 | $585,320 | $1,585,000 |
| Contributions to M&M 401(k) Plan | Various Dates | DEM Sr. | M&M 401K | $58,500 | $7,762 | $66,262 |

[16] DEM Sr. is insolvent as early as September 30, 1998, if his retirement assets are considered exempt assets.

Contains confidential information subject to protective order

* * * * * *

- DPM became insolvent no later than September 30, 1998 and has remained insolvent through the date of this report.
- Based on the discovery to date, I have not identified any transfers in which DPM did not receive reasonably equivalent value.

## V.      Damages Analysis

For purposes of my analysis, I have considered damages resulting from DEM Sr.'s alleged breach of contract as a result of his default under the Notes.  Under a breach of contract theory, I assumed that the Notes are enforceable contracts between Conseco and DEM Sr. DEM Sr.'s obligations under the Notes, as of June 30, 2002, totaled approximately $41.6 million.[17]  To determine the damages incurred by Conseco resulting from DEM Sr.'s defaults under this obligation, I applied the interest rate calculation set forth in the Notes to the principal balance on the Note obligations as of June 30, 2002 through the date of this report. I calculated that Conseco has incurred damages resulting from DEM Sr.'s default under the Notes of approximately $77.2 million plus reasonable attorneys' fees and costs of collection.

Applying the same methodology described above, I have considered the damages resulting from DPM's alleged breach of contract as a result of its default under the Notes.  DPM's obligations under the Notes, as of June 30, 2002, totaled approximately $58.0 million.[18]  I calculated that Conseco has incurred damages resulting from DPM's default under the Notes of approximately $107.5 million plus reasonable attorneys' fees and costs of collection.

Separately, I have considered the damages resulting from DEM Sr.'s alleged breach of contract as a result of his default under the Services Notes.  Under a breach of contract theory, I assumed that the Services Notes are enforceable contracts between Conseco

---

[17] Conseco, Inc. Director, Officer and Key Employee Stock Purchase Plan Account Statement – As of June 30, 2002 (C74723)

[18] Conseco, Inc. Director, Officer and Key Employee Stock Purchase Plan Account Statement – As of June 30, 2002 (C74867)

Contains confidential information subject to protective order

Services and DEM Sr.  DEM Sr.'s obligations under the Services Notes included a principal balance as of June 30, 2002, of $11.6 million[19] plus interest payments and agency fees paid in July 2002 and September 2002 for a total balance of $11.8 million[20].  To determine the damages incurred by Conseco Services resulting from DEM Sr.'s alleged defaults under these obligations, I applied the interest rate calculation set forth in the Services Notes to the principal balance on the Services Notes obligations as of June 30, 2002 through the date of this report.  I calculated that Conseco Services has incurred damages resulting from DEM Sr.'s default under the Services Notes of approximately $22.0 million plus reasonable attorneys' fees and costs of collection.

Applying the same methodology, I have considered the damages resulting from DPM's alleged breach of contract as a result of its default under the Services Notes.  DPM's obligations under the Services Notes included a principal balance as of June 30, 2002, of $16.6 million[21] plus interest payments and agency fees paid in July 2002 and September 2002 for a total balance of $16.8 million[22].  I calculated that Conseco Services has incurred damages resulting from DPM's default under the Services Notes of approximately $31.5 million plus reasonable attorneys' fees and costs of collection.

## VI.    Fraudulent Conveyance Analysis

In addition to assessing damages, I have been asked to review a number of transactions and transfers undertaken by DEM Sr. since the inception of his obligations under the Notes and Services Notes and to determine whether any of these transactions meet the financial conditions that constitute a fraudulent conveyance as defined within Section 32-18-2-14 or 32-18-2-15 of the Indiana Uniform Fraudulent Transfer Act ("IUFTA").

---

[19] Conseco, Inc. Director, Officer and Key Employee Stock Purchase Plan Account Statement – As of June 30, 2002 (C74723)

[20] Director and Officer Loans Conseco Services L.L.C. Promissory Note Outstanding Balance Calculation (No Bates Number)

[21] Conseco, Inc. Director, Officer and Key Employee Stock Purchase Plan Account Statement – As of June 30, 2002 (C74723)

[22] Director and Officer Loans Conseco Services L.L.C. Promissory Note Outstanding Balance Calculation (No Bates Number)

Contains confidential information subject to protective order

To determine if a fraudulent conveyance occurred, I reviewed DEM Sr.'s personal financial condition, as well as numerous transfers and transactions he engaged in between September 30, 1999 and the date of this report.  Specifically, this review was performed to determine if DEM Sr. (1) became insolvent as a result of, or was insolvent as of the date of each transfer analyzed and (2) received reasonably equivalent value for each asset transferred and/or liability assumed.

**A.  DEM Sr. Solvency**

DEM Sr. historically owned directly or indirectly various assets, including cash, stocks, options, real estate, partnership interests, and various other types of personal property.  To determine DEM Sr.'s solvency[23] at various points in time, I reviewed balance sheets provided by DEM Sr. as of:

- April 30, 1998 [24];
- September 16, 1999 [25];
- May 16, 2000 [26];
- December 15, 2000 [27];
- December 31, 2000 [28]
- December 18, 2001 [29];
- December 2001 [30]; and
- January 20, 2003 [31].

---

[23] For the purposes of my analysis, I have defined solvency based on the "*Balance Sheet Test.*" Therefore, insolvency exists when the fair market value of liabilities exceeds the fair market value of assets.

[24] Balance Sheet Dennis E. Murray, Sr. – Peggy A. Murray April 30, 1998 (MM013571)

[25] The Private Bank Personal Financial Statement - DMS and DPM Ltd. dated as of September 16, 1999 (No Bates Number)

[26] Individual Analysis of Joint Balance Sheet of May 16, 2000 (C07908)

[27] Balance Sheet Dennis E. Murray, Sr. December 15, 2000 (No Bates Number)

[28] The Private Bank Personal Financial Statement - DMS and DPM Ltd. dated as of December 31, 2000 (C07962 – C07965)

[29] Balance Sheet Dennis E. Murray, Sr. December 18, 2001 (No Bates Number)

[30] The Private Bank Personal Financial Statement - DMS and DPM Ltd. dated as of December 2001 (C102515 – C102517)

[31] Balance Sheet Dennis E. Murray, Sr. January 20, 2003 (No Bates Number)

Contains confidential information subject to protective order

These balance sheets included assets and liabilities related to the following entities:  DEM Sr. personally; MAM personally; jointly held assets of DEM Sr. and MAM[32]; DEM Sr. retirement assets; DPM; and Central Avenue Corporation.

In addition, I reviewed financial data provided in this matter including bank statements, brokerage statements, federal income tax returns, D&O Loan Program documents, other produced documents, and publicly available information.   Using this data, I constructed balance sheets as of selected dates for DEM Sr. included in the table below.  To construct these balance sheets, I have (1) included 50% of the value of jointly held bank accounts[33], (2) updated the market value of his securities, (3) included 100% of his retirement assets[34] and 100% of Central Avenue Corporation[35], (4) included DEM Sr.'s assets and liabilities related to the D&O Loan Program (5) included Murray & Murray assets prior to the transfer of those

---

[32] For purposes of my solvency analysis, I have assumed that the jointly held assets are evenly divided between DEM Sr. and MAM based on DEM Sr.'s deposition testimony (Deposition of Dennis E. Murray, Sr. pages 65, 284 -285).  During the course of their marriage, MAM was employed as a teacher for a half of a year nearly 47 years ago.  (Deposition of Margaret A. Murray, page 16.)  On their jointly filed federal income tax returns, MAM listed her occupation as a homemaker and has not held full-time employment in nearly 47 years.  In her deposition, MAM listed the following as sources of income: (1) a salary of approximately $600 per year from Murray & Murray Co., L.P.A., (2) $7,200 per year as rental income from a farm inherited from her parents, (3) dividend payments from stocks including Citizens Bank and Leucadia estimated at $20,000 per year, and (4) access to a trust funded by Murray & Murray Co., L.P.A. distributions held at U.S. Bank, which currently contains between $1.7 million to $2 million (Deposition of Margaret A. Murray, pages 22- 26).

[33] The jointly held assets include various bank accounts that list DEM Sr. and MAM as holders of the accounts.  In his deposition, DEM Sr. stated that he considered the joint assets to be equally divided between himself and MAM (Deposition of Dennis E. Murray, Sr. pages 65, 284 -285).

[34]  DEM Sr. has not produced discovery regarding DEM Sr.'s and DPM's retirement accounts.  (Dennis Murray's Amended Resp. to Conseco's First Request for Production, Response #5)  I understand from counsel that only select retirement assets are exempt from collection by creditors based on certain legal criteria.  As a result of DEM Sr.'s failure to produce discovery related to DEM Sr.'s retirement accounts, the complete character and amount of DEM Sr.'s retirement assets is unknown.  For purpose of my solvency analysis, I have assumed that these assets are non-exempt assets and included these assets in DEM Sr.'s net worth.  Should the Court determine that these assets are exempt assets and should be excluded from this analysis, DEM Sr. becomes insolvent as of September 30, 1998 and remains insolvent through the date of this report.

[35] Central Avenue Corporation's 2004 through 2006 federal tax returns list DEM Sr. as 100% owner of this corporation (MM018117, MM018134, MM018149). For prior years, the federal tax returns do not include this information.  In his deposition, DEM Sr. stated that he and MAM had a fifty percent ownership interest in Central Avenue with his children holding a remainder interest (Deposition of Dennis E. Murray, Sr. pages 261- 262).   According to Central Avenue Corporation's annual shareholder and director meeting minutes, DEM Sr. is the sole director of Central Avenue Corporation and DEM Sr. and MAM are co-life tenant shareholders.  (MM012711 – MM012724).  For purposes of my solvency analysis, I have conservatively assumed that DEM Sr. was 100% owner of Central Avenue Corporation for the period included in my analysis, which is based on the federal tax returns.

Contains confidential information subject to protective order

assets discussed below, (6) included 50% of DPM's net equity value due to his standing as a general partner of DPM [36], and (7) excluded MAM assets[37] and certain claims that DEM Sr. and DPM have alleged against the Defendants[38].   For assets without an observable market value, I included the value from the closest DEM Sr. prepared balance sheet.[39]

Table 4 below outlines the results of my analysis related to DEM Sr.'s solvency on the dates above.

---

[36] I understand that there is a dispute between the parties regarding if and when MAM resigned as a general partner from DPM.  For purposes of this analysis, I have included MAM as a general partner.  Further, I have assumed that MAM would have been able to meet her obligation related to 50% of DPM's obligations.

[37] DEM Sr. represented in his deposition that the farms included on his balance sheet were always in MAM's name.  However, MAM indicated in her deposition that DEM Sr. owned a portion the Huron-Avery property that he transferred to his brother. (Deposition of Margaret A. Murray, pages 122 - 123.).  For purposes of this analysis, I have excluded the farms, but will update based on additional discovery.

[38] Plaintiffs are asserting certain claims related to alleged fraud and indemnification issues with respect to the D&O Loan Program.  Due to the speculative nature of the value, if any, of these claims and my consideration of the facts and circumstances in this case, I have not included these claims within my solvency analysis.

[39] On the December 31, 2000 and December 18, 2001 DEM Sr. presented balance sheets, DEM Sr. includes a Note Payable – Other.  I have not been able to substantiate these notes and have excluded them to be conservative.

Contains confidential information subject to protective order

| Table 4: Constructed DEM Sr. Statements of Net Worth | | | | | | |
|---|---|---|---|---|---|---|
| Description | 06/30/99 | 09/30/99 | 12/31/99 | 12/31/00 | 12/31/01 | 06/30/02 |
| Assets | | | | | | |
| National City Acct 28951 | - | - | - | 255,177 | 111,664 | 72,944 |
| Citizens Bank Acct 100110170 | - | - | - | 20,871 | 8,781 | 2,051 |
| Citizens Bank Acct 304565 | - | - | - | 66 | 66 | 1,066 |
| Vanguard Acct 9946517179 | - | - | - | - | 45,540 | - |
| Dreyfus Acct 124-0220695795 | 648,021 | 731,715 | 1,443,833 | 23,840 | 42,251 | 90,243 |
| Cash | 648,021 | 731,715 | 1,443,833 | 299,954 | 208,302 | 166,303 |
| | | | | | | |
| Conseco (20,925 shares) - DEM Sr. [1] | 636,905 | 397,575 | 372,727 | 275,948 | 93,326 | 41,850 |
| Conseco - 65,000 options, stock units, def comp [1,2] | 1,978,438 | 1,235,000 | 1,157,813 | 857,188 | 289,900 | 130,000 |
| Stock other than Conseco: | | | | | | |
| Leucadia shares - 7,360 [3] | 186,760 | 154,560 | 170,200 | - | - | - |
| First Citizens Banc Corp shares - 37,548 [3] | 1,051,344 | 1,051,344 | 1,088,892 | - | - | - |
| Morgan Stanley Acct 524 048008 | 137,053 | 116,018 | 116,294 | 10,104 | 14,355 | 12,299 |
| Salomon Smith Barney Acct 11B-00166-11 261 | - | - | - | 6,520 | 38,530 | 68,331 |
| Securities | 3,990,499 | 2,954,497 | 2,905,925 | 1,149,759 | 436,110 | 252,480 |
| | | | | | | |
| Conseco (631,408 shares) [1,4] | 19,218,481 | 11,996,752 | 11,246,955 | 8,326,693 | 2,816,080 | 1,262,816 |
| Benefit Plan assets, other than Conseco [5] | 4,000,000 | 3,011,709 | 3,011,709 | 5,000,812 | 5,000,812 | 5,000,812 |
| Retirement Assets | 23,218,481 | 15,008,461 | 14,258,664 | 13,327,505 | 7,816,892 | 6,263,628 |
| | | | | | | |
| Conseco Stock - D&O | 25,415,313 | 15,865,000 | 28,174,975 | 20,859,368 | 7,054,618 | 3,163,506 |
| | | | | | | |
| Murray & Murray (Value to DEM Sr.) [6] | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | - | - |
| 111 E. Shoreline Drive (Office Bldg. Owned for Investment) [6] | 1,100,000 | 1,100,000 | 1,100,000 | 1,000,000 | - | - |
| Murray & Murray Assets [7] | 2,600,000 | 2,600,000 | 2,600,000 | 2,500,000 | - | - |
| | | | | | | |
| Central Avenue Corp. Assets [8] | 1,250,000 | 1,250,000 | 1,250,000 | 1,250,000 | 1,250,000 | 1,250,000 |
| | | | | | | |
| Total Assets | 57,122,314 | 38,409,673 | 50,633,397 | 39,386,586 | 16,765,923 | 11,095,917 |
| | | | | | | |
| Liabilities | | | | | | |
| D&O Note Balances - Murray [9] | 25,811,254 | 25,811,254 | 41,639,388 | 41,639,388 | 41,631,174 | 41,618,499 |
| Conseco Services Note Balance - Murray [9] | 2,079,307 | 2,374,277 | 2,836,202 | 6,865,446 | 10,407,144 | 11,594,671 |
| Total Notes Payable | 27,890,561 | 28,185,531 | 44,475,590 | 48,504,833 | 52,038,318 | 53,213,170 |
| | | | | | | |
| NET WORTH - UNADJUSTED | 29,231,752 | 10,224,142 | 6,157,807 | (9,118,247) | (35,272,395) | (42,117,253) |
| | | | | | | |
| Adjustments: | | | | | | |
| Add: Notes Receivable - DPM [10] | 286,034 | 286,034 | 286,034 | 48,000 | 108,000 | 108,000 |
| Add: Notes Receivable - Murray & Murray [11] | 540,000 | 540,000 | 320,000 | 320,000 | 308,240 | 308,240 |
| Remove: 50% of Joint Assets [12] | (324,010) | (365,858) | (721,917) | (149,977) | (104,151) | (83,152) |
| Include: 50% of DPM Net Equity [13] | (7,567,302) | (13,457,482) | (15,652,412) | (22,159,866) | (32,408,450) | (35,376,134) |
| ADJUSTED NET WORTH | 22,166,473 | (2,773,163) | (9,610,487) | (31,060,090) | (67,368,757) | (77,160,299) |

Notes:
1. Share quantities were obtained from the Analysis of Conseco Ownership (SK008704) and verified against SEC Form 4 & Form 5 filings.
2. Option values are computed as 65,000 shares at the closing price for the balance sheet date. Any exercise costs have not been included.
3. Number of shares per Trust Agreement "Trustor Dennis E. Murray Sr./Trustee Dennis E. Murray Jr. for the Benefit of Dennis E. Murray Sr. & Margaret A. Murray."
4. Conseco retirement assets are computed as 631,408 shares of Conseco stock at the closing price for the balance sheet date.
5. Benefit Plan assets other than Conseco is based on presented financial information.
6. Murray & Murray asset line items are based on presented financial information.
7. DEM Sr. transferred his interest in Murray & Murray Co., LPA to a Trust effective 10/1/01 (SK000432).
8. Includes Sailfish Point condo, cars, and boats.
9. Based on Katz, Sapper & Miller LLP's quarterly statements.
10. Based on the closest prior DPM balance sheet.
11. Based on the closest prior Cognovit note between DEM Sr. and Murray & Murray Co., LPA.
12. Joint Assets include all Cash account balances.
13. For purposes of this analysis, I have conservatively included only DEM Sr's. 50% share of the DPM equity.

Contains confidential information subject to protective order

Based on these analyses of DEM Sr.'s financial condition, DEM Sr. became insolvent no later than September 30, 1999 and remained insolvent from that date through the date of this report. [40]

### B.  DPM Solvency

DPM historically owned various assets, including cash, stocks, and bonds.  To determine DPM's solvency[41] at various points in time, I reviewed the annual December 31 balance sheets provided by James Sacher, DPM and DEM Sr.'s accountant during the years 1997 through 2006.[42]  These balance sheets were prepared for tax purposes and appear to include values based on historic cost for marketable securities and not market values as of the date of the balance sheet.   I have adjusted these historic costs to reflect the market value of the publicly traded securities as of the date of the balance sheets.

In addition, I reviewed financial data provided in this matter including bank statements, brokerage statements, federal income tax returns, D&O Loan Program documents, other produced documents, and publicly available information.   Using this data, I constructed balance sheets applying the same methodology described above for DPM for select dates included in the table below.  During this period, DPM's major asset was Conseco stock held as part of the D&O Program.

Table 5 below outlines the results of my analysis related to DPM's solvency.

---

[40] The principal asset that impacts DEM Sr.'s net worth is Conseco stock.  As a result, changes in the Conseco share price have a dramatic impact on his solvency.  On September 19, 1999, Conseco share price was $22.31.  On September 30, 1999, Conseco share price declined to $19.00.

[41] For the purposes of my analysis, I have defined solvency based on the *"Balance Sheet Test."* Therefore, insolvency exists when the fair market value of liabilities exceeds the fair market value of assets.

[42] James Sacher has provided accounting services to DEM Sr. and his related entities since the early 1980s (Deposition of James Sacher, page 39).

Contains confidential information subject to protective order

| | Table 5: Constructed DPM Balance Sheets | | | | | | |
|---|---|---|---|---|---|---|---|
| **Description** | **6/30/1998** | **9/30/1998** | **12/31/1998** | **12/31/1999** | **12/31/2000** | **12/31/2001** | **6/30/2002** |
| Cash: | | | | | | | |
| Citizens Bank Acct 615240 | - | - | - | 73,400 | 20,053 | 70,303 | 45,227 |
| Citizens Bank Acct 58886 | - | - | 1,572 | 1,523 | (503) [1] | (503) [1] | |
| Citizens Bank Acct 58894 | - | - | - | 28,771 | 8,341 | 10,348 [1] | 10,348 [1] |
| National City Acct 2009375 | - | - | 53,189 | - | - | - | - |
| **Total Cash** | **110,225** [1] | **110,225** [1] | **53,189** | **103,742** | **29,917** | **80,148** | **55,072** |
| Other Assets | | | | | | | |
| **Capitalized Loan Fees** [1] | **-** | **-** | **11,586** | **9,103** | **605,920** | **369,421** | **369,421** |
| Investments: | | | | | | | |
| Conseco Common - 3,075 shares [2] | 144,141 | 93,980 | 93,788 | 54,773 | 40,552 | 13,715 | 6,150 |
| Other Investments (McDonald/SSB) [3] | - | - | 77,559 | 2,834 | 126 | - | - |
| Conseco CBO [1] | 273,255 | 273,255 | 273,255 | 237,299 | - | - | - |
| Conseco Stock - D&O [4] | 28,125,000 | 29,798,438 | 29,737,500 | 30,668,725 | 22,705,618 | 7,679,018 | 3,443,506 |
| Hahn-Seaway Company [1] | 150,000 | 150,000 | 150,000 | 150,000 | 193,313 | - | - |
| Morgan Stanley Acct 524 058176 104 | 172,599 | 170,652 | 166,875 | 147,827 | 129,881 | 78,068 | 51,262 |
| **Total Investments** | **28,864,994** | **30,486,325** | **30,498,976** | **31,261,458** | **23,069,489** | **7,770,801** | **3,500,918** |
| **Total Assets** | **28,975,219** | **30,596,550** | **30,563,750** | **31,374,304** | **23,705,326** | **8,220,370** | **3,925,410** |
| Liabilities: | | | | | | | |
| Morgan Stanley - Margin [1] | - | - | 89,044 | 95,969 | - | - | - |
| Payable - MAM [1] | - | - | 6,685 | - | - | - | - |
| Partner Advances [1] | 1,085 | 1,085 | 1,085 | 1,085 | 1,085 | 1,085 | 1,085 |
| **Total Current Liabilities** | **1,085** | **1,085** | **96,814** | **97,054** | **1,085** | **1,085** | **1,085** |
| Long Term Liabilities: | | | | | | | |
| Note Balance - DPM [4] | 25,981,005 | 42,203,085 | 42,203,085 | 58,031,218 | 58,031,218 | 58,019,772 | 58,002,107 |
| Conseco Services Note Balance - DPM [4] | 1,055,267 | 1,496,308 | 1,984,980 | 4,264,822 | 9,944,755 | 14,908,414 | 16,566,487 |
| **Total D&O Balance - DPM** | **27,036,272** | **43,699,393** | **44,188,064** | **62,296,040** | **67,975,973** | **72,928,186** | **74,568,594** |
| DEM Sr Loan [1] | - | - | - | - | 28,000 | 88,000 | 88,000 |
| DEM Sr Note - CBO [1] | 300,000 | 300,000 | 266,034 | 266,034 | - | - | - |
| DEM Sr Note - Hahn Seaway [1] | 90,000 | 90,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| McDonald & Co [1] | 60,000 | 60,000 | - | - | - | - | - |
| **Total Other Long Term Liabilities** | **450,000** | **450,000** | **286,034** | **286,034** | **48,000** | **108,000** | **108,000** |
| **Total Equity** [5] | **1,487,863** | **(13,553,928)** | **(14,007,162)** | **(31,304,824)** | **(44,319,732)** | **(64,816,900)** | **(70,752,268)** |
| **Total Liabilities & Equity** | **28,975,219** | **30,596,550** | **30,563,750** | **31,374,304** | **23,705,326** | **8,220,370** | **3,925,410** |

**Notes:**
1. Value per DPM Ltd's. closest prior presented balance sheet.
2. Conseco Common was held in a McDonald & Co. brokerage account and transferred to a Salomon Smith Barney account. Both accounts were in DPM Ltd's. name.
3. Other investments include securities and cash or cash equivalents. For 6/30/98 and 9/30/98 I have assumed Conseco shares were the only asset held in the McDonald account per the 1998 statement.
4. Based on Katz, Sapper & Miller LLP's quarterly statements (share quantity and loan balances) and Bloomberg (stock price).
5. The net equity was computed as the difference between total assets and total liabilities.

Based on this analysis of DPM's financial condition, DPM became insolvent on September 30, 1998 and remained insolvent from that date through the date of this report.

Contains confidential information subject to protective order

## C.  Transactions and Reasonably Equivalent Value – DEM Sr.

The second prong of the fraudulent conveyance test is to determine whether or not DEM Sr. received reasonably equivalent value for every asset transferred or liability assumed while he was insolvent.

As described above, DEM Sr.'s wealth has historically been comprised of cash, marketable securities, real estate, ownership interest in Murray & Murray, and various other types of personal property.  Based on my review of the documents produced to date, I have identified several transactions (discussed in detail below) that occurred on or after September 30, 1999, in which DEM Sr. did not receive reasonably equivalent value.

The majority of the transfers described below are from DEM Sr. to entities that ultimately benefit MAM.  As discussed previously, during the course of their marriage, MAM has not contributed any significant active income to the household.   Therefore, the assets that MAM currently holds are the result of various transfers from DEM Sr. to MAM over the course of their marriage or from inheritances from her family.[43]

### 1.  Transfer of Murray & Murray Ownership Interest

As a partner of Murray & Murray, DEM Sr. held an ownership interest in the firm for a number of years.[44]   This ownership interest entitled DEM Sr. to receive two forms of monetary compensation (1) wages from his practice of law and (2) a pro-rata portion of the firm's profits, which were generated from the law practice, an ownership interest in the

---

[43] Currently, the Court has stayed discovery regarding MAM's financial condition.  I understand that counsel for the Defendants has requested that this stay be lifted and that MAM produce information regarding her financial condition over time.  I reserve the right to amend this analysis should MAM produce information, which may lead to additional fraudulent transfers.

[44] Deposition of Dennis E. Murray Sr. pages 18 – 19, 39.  DEM Sr. signed a stock redemption and salary continuation agreement with Murray & Murray dated July 29, 1994 in which DEM Sr. is listed as shareholder.   Murray & Murray Co., L.P.A. Stock Redemption and Salary Continuation Agreement (MM000579)

Contains confidential information subject to protective order

firm's office building, and from a marina located next to the firm's office building.[45, 46]  As of August 1, 2000, DEM Sr. owned 11.49% of Murray & Murray.[47]

In a trust undertaking/agreement dated September 6, 2000 ("DEM Sr. Irrevocable Trust dated 09/06/00"), Dennis E. Murray Jr. agreed to hold in trust for the benefit of MAM all shares of Murray & Murray which were owned by and for the benefit of DEM Sr.[48]  This transfer was effectuated more than a year later on October 1, 2001 when DEM Sr. assigned all shares in Murray & Murray to the DEM Sr. Irrevocable Trust dated 09/06/00, which Dennis E. Murray,  Jr. acted as trustee.[49]

Subsequent to the formation of the DEM Sr. Irrevocable Trust dated 09/06/00, a separate trust dated February 27, 2001 was created by MAM as grantor and beneficiary with US Bank[50] as the trustee ("MAM Trust No. 2").[51]  The MAM Trust No. 2 was the ultimate beneficiary of the transfer of DEM Sr.'s Murray & Murray ownership interest.[52]  After the formation of the two trusts and assignment of DEM Sr.'s shares to the DEM Sr. Irrevocable Trust, MAM was the beneficiary of the profit sharing payments from Murray & Murray that represented DEM Sr.'s portion of the firm's profits.[53]  DEM Sr. stated that he did not receive any consideration for the transfer of his ownership because at the time of the transfer DEM

---

[45] Deposition of Dennis E. Murray, Sr. pages 20 – 21, 269 - 271.  Deposition of Dennis E. Murray, Jr. 30(b)(6), pages 42 – 43.

[46] Murray & Murray Co L.P.A. Interim Financial Analysis August 1, 2000 (SK003161)

[47] Murray & Murray Co L.P.A. Interim Financial Analysis August 1, 2000 (SK003161).  On his May 16, 2000 balance sheet, DEM Sr. estimated the value of this interest at $2.5 million.  DEM Sr. estimated the value of the law practice at $1.5 million and the value of the office building at $1.0 million.  He did not ascribe a separate value to the marina.  Individual Analysis of Joint Balance Sheet of May 16, 2000 (C 07908).  Subsequent balance sheets do not provide a value for DEM Sr.'s ownership interest in Murray & Murray.

[48] Trust Undertaking/Agreement by Trustee Dennis E. Murray, Jr. for the benefit of Margaret A. Murray dated September 6, 2000 (SK000428)

[49] Assignment Dennis E. Murray, Sr. to Dennis E. Murray, Jr., Trustee dated October 1, 2001 (SK000432)

[50] US Bank was formerly known as Firstar Bank, N.A. of Cleveland.  As of the date of this report, US Bank has not produced documents related the MAM Trust No. 2.  I understand from counsel that US Bank has agreed to produce documents and I will update and amend this report based upon additional information, as appropriate.

[51] Trust Agreement No. 2 of Margaret A. Murray (SK002421)

[52] Qualified Subchapter S Trust Election by Beneficiary dated December 7, 2001 (SK002454 – SK002455)

[53] DEM Sr. stated in his deposition that he continues to receive wages from Murray & Murray, which are deposited into a Citizens Bank account (Deposition of Dennis E. Murray, Sr. pages 77 – 78).  On September 10, 2008, two days prior to the date of this report, I received copies of bank statements that appear to include DEM Sr.'s wages from Murray & Murray from 2003 forward.  Due to the late production of these documents, I have not fully analyzed these documents and will update my report, as appropriate.

Contains confidential information subject to protective order

Sr. did not ascribe any value to his Murray & Murray ownership interest,[54] despite the fact that on previously produced statements of net worth he listed the value of his ownership interest between $2.5 million and $2.6 million. In 2001, the DEM Sr. Irrevocable Trust dated 09/06/00 received distributions from Murray & Murray. As part of its 2001 federal tax return, the DEM Sr. Irrevocable Trust dated 09/06/00 attributed 50% of the Murray & Murray distributions to DEM Sr. and 50% to MAM, which distributions totaled $254 thousand.[55] For purposes of this analysis, I have assumed that DEM Sr. received 50% of this distribution.

Subsequently, between 2002 and 2007, the MAM Trust No. 2 received $1.8 million in distributions from Murray & Murray[56] based on MAM Trust No. 2's effective ownership of DEM Sr.'s Murray & Murray shares that DEM Sr. considered to have no "tangible wealth" at the time of the transfer.[57] Further, MAM indicated that the MAM Trust No. 2 was created so "I would be the benefit of Dennis -- so that I would be the benefit eventually of Dennis' hard work versus Conseco."[58] As of August 2008, MAM indicated that the MAM Trust No. 2 had assets between $1.7 million and $2.0 million.[59]

Based on my review of the discovery to date in this matter, I have not found any evidence that the DEM Sr. Irrevocable Trust dated 09/06/00, the MAM Trust No. 2, or MAM, personally, provided DEM Sr. any consideration as part of this transaction. Therefore, DEM Sr.'s transfer of this asset and the subsequent distributions resulted in transactions in which he did not receive reasonably equivalent value.

---

[54] Deposition of Dennis E. Murray, Sr. pages 56 -58, 209 - 210
[55] Form 1041 for the period ending December 31, 2001 (SK000458 – SK000473.)
[56] Murray Parties' Response to Conseco's Motion to Compel Dennis Murray's Production of Statements for his Retirement Accounts and for Other Sanctions and Motion to Lift Discovery Stay as to Margaret Murray dated August 18, 2008, pages 8 - 9.
[57] Deposition of Dennis E. Murray, Sr., page 55
[58] Deposition of Margaret A. Murray, page 108
[59] Deposition of Margaret A. Murray, page 26

Contains confidential information subject to protective order

The transfer of the Murray & Murray ownership interest precipitated subsequent cash distributions which resulted in a consideration shortfall of $2.0 million.[60]  In addition to the consideration shortfall, I calculated prejudgment interest from the respective dates of each distribution through the date of this report using the Indiana prejudgment rate of 8% simple interest.[61]  The amount of prejudgment interest is $879 thousand resulting in a total shortfall of $2.8 million.

Table 6 below provides a summary list of assets transferred and the corresponding date of each transfer.

| | Table 6: Transfer of Distributions from Murray & Murray | | | | | |
|---|---|---|---|---|---|---|
| Transfer | Transfer Date | Transferor | Transferee | Transfer Amount | Prejudgment Interest | Total |
| Murray & Murray Ownership Distributions | 12/31/01 | DEM Sr. | DEM Sr. Irrev Trust | $127,228 | $68,236 | $195,463 |
| | 12/31/02 | DEM Sr. | MAM Trust No. 2 | $1,542,221 | $703,760 | $2,245,981 |
| | 12/31/03 | DEM Sr. | MAM Trust No. 2 | $261,642 | $98,463 | $360,105 |
| | 12/31/04 | DEM Sr. | MAM Trust No. 2 | ($46,060) | ($13,639) | ($59,699) |
| | 12/31/05 | DEM Sr. | MAM Trust No. 2 | $108,420 | $23,431 | $131,851 |
| | 12/31/06 | DEM Sr. | MAM Trust No. 2 | $1,955 | $266 | $2,221 |
| | 12/31/07 | DEM Sr. | MAM Trust No. 2 | ($33,549) | ($1,882) | ($35,431) |
| Murray & Murray Ownership Distributions | Various Dates | DEM Sr. | MAM Trust No. 2 & DEM Sr. Irrev Trust | $ 1,961,857 | $878,634 | $2,840,491 |

### 2. *Transfer of First Citizens Banc Corp and Leucadia National Shares*

In a separate trust agreement dated September 6, 2000 (the "Litigation Trust"), DEM Sr. contributed 37,548 shares of First Citizens Banc Corp. and 7,360 shares of Leucadia National

---

[60] This consideration shortfall pertains exclusively to distributions from Murray & Murray.  In addition, DEM Sr. transferred his interest in the tangible assets of Murray & Murray, which included the pro-rata portion of the firm's office building and marina.  Given the limited production regarding the financial condition of Murray & Murray, the value of these assets at the time of transfer is not known.  However, on his May 16, 2000 balance sheet, DEM Sr. estimated the value of this interest at $2.5 million.  DEM Sr. estimated the value of his interest in the law practice at $1.5 million and the value of his interest in the office building at $1.0 million.  He did not ascribe a separate value to the marina.  Individual Analysis of Joint Balance Sheet of May 16, 2000 (C 07908).

[61] IC 24-4.6-1-103.

Contains confidential information subject to protective order

Corp. to the Litigation Trust to fund future legal services.[62, 63]   The value of these shares on September 6, 2000 was $933 thousand.[64]   Based on federal tax returns, these shares are included in the DEM Sr. Irrevocable Trust dated September 6, 2000, of which DEM Sr. and MAM are equal beneficiaries in 2001.   Subsequent federal tax returns indicate that MAM is the sole beneficiary.   For purposes of my analysis, I have assumed that the shares are held in the DEM Sr. Irrevocable Trust dated September 6, 2000 and 50% of the value of the shares was transferred for MAM's benefit on September 6, 2000 and the remaining 50% of the value of the shares was transferred for MAM's benefit on December 31, 2001.

Based on my review of the discovery to date in this matter, I have not found any evidence that the DEM Sr. Irrevocable Trust or MAM provided DEM Sr. any consideration as part of this transaction.   Therefore, DEM Sr.'s transfer of this asset resulted in a transaction in which he did not receive reasonably equivalent value.

The transfers of the Citizens Bank and Leucadia stock resulted in a consideration shortfall of $1.0 million.   In addition to the consideration shortfall, I calculated prejudgment interest from the respective dates of each transfer through the date of this report using the Indiana prejudgment rate of 8% simple interest.[65]   The amount of prejudgment interest is $585 thousand, resulting in a total shortfall of $1.6 million.

Table 7 below provides a summary list of assets transferred and the corresponding date of each transfer.

---

[62] Trust Agreement Trustor Dennis E. Murray, Sr. / Trustee Dennis E. Murray, Jr. for the benefit of Dennis E. Murray, Sr. and Margaret A. Murray (MM018975).   Based on the federal tax returns, the Litigation Trust assets appear to be reported as assets of the DEM Sr. Irrevocable Trust dated 09/06/00, even though two separate trust agreements exist.   For purposes of this analysis, I have relied on the federal tax returns filed by the DEM Sr. Irrevocable Trust dated 09/06/00.

[63] DEM Sr. stated in his interrogatory responses #3 and # 8 that he owned 10,000 Leucadia share (LUK) and 34,560 First Citizens Banc Corp shares and that those shares were transferred into a trust for litigation. (Responses to Conseco, Inc.'s First Set of Interrogatories to Dennis E. Murray, Sr.)

[64] As of September 6, 2000, First Citizens Banc Corp's share price was $20.00 per share and Leucadia National Corp's share price was $24.688 per share.

[65] IC 24-4.6-1-103

Contains confidential information subject to protective order

| | Table 7: Transfer of First Citizens Banc and Leucadia Stock | | | | | |
|---|---|---|---|---|---|---|
| Transfer | Transfer Date | Transferor | Transferee | Transfer Amount | Prejudgment Interest | Total |
| 7,360 Leucadia shares and 37,548 First Citizens Banc shares | 09/06/00 | DEM Sr. | DEM Sr. Irrev Trust | $466,330 | $299,269 | $765,599 |
| | 12/31/01 | DEM Sr. | DEM Sr. Irrev Trust | $533,350 | $286,051 | $819,401 |
| 7,360 Leucadia shares and 37,548 First Citizens Banc shares | Various Dates | DEM Sr. | DEM Sr. Irrev Trust | $999,680 | $585,320 | $1,585,000 |

### 3. Transfer of DEM Sr. personal retirement assets to the DPM Defined Benefit Pension Plan and Trust [66]

In early 2000, DPM Ltd. Defined Benefit Pension Plan and Trust ("DPM Pension Plan") was formed with the intent to supplement its employees' retirement income by providing, at DPM's expense, retirement benefits for the employees and their spouses.[67]   An additional consideration for creating the DPM Pension Plan was that it "was solely created to remove assets from your [DEM Sr.'s and MAM's] estate."[68]  Interestingly, in notes produced by Mr. Sacher related to the preparation of DEM Sr.'s 2000 joint return, Mr. Sacher appears to have had discussion with DEM Sr. regarding protecting his assets from Conseco.  The notes state "anything with anti-alienation provisions is kept out of their recovery by Conseco."[69]

In early May 2000, DEM Sr. provided Actuarial Business Solutions, L.L.C., a firm hired by DEM Sr. to design and implement the DPM Pension Plan[70], with a Resolution by DPM adopting the Defined Benefit Pension Plan and Trust.[71]  DEM Sr. claimed in his deposition that sometime in 2000 he personally funded the DPM Pension Plan with assets that originated from his prior Murray & Murray "qualified" plan for the benefit of all of DPM's

---

[66]  DEM Sr. has not produced discovery regarding DEM Sr.'s and DPM's retirement accounts.  (Dennis Murray's Amended Resp. to Conseco's First Request for Production, Response #5)  I understand from counsel that only select retirement assets are exempt from collection by creditors based on certain legal criteria.  As a result of DEM Sr.'s failure to produce discovery related to DEM Sr.'s retirement accounts, the complete character and amount of DEM Sr.'s retirement assets is unknown.  For purpose of this analysis, I have assumed that these assets are non-exempt assets and included these assets as fraudulent transfers.  Should the Court determine that these assets are exempt assets, I will adjust my analysis, as appropriate.

[67]  Summary Plan Description for DPM Limited Defined Benefit Pension Plan and Trust (SK005761).  The Plan's original effective date was January 1, 2000.

[68]  Letter from DEM Sr. to Mark McLaren dated October 27, 2000 (SK005610); Memorandum from Mark McLaren to DEM Sr. dated November 2, 2000 (SK005611 – SK005613).

[69]  Handwritten notes (SK003102).

[70]  Executed Letter of Engagement dated July 2, 1999 (SK005588 – SK005591).

[71]  Letter to Mark P. McLaren of Actuarial Business Solutions, L.L.C. from Dennis E. Murray, Jr. (SK005597 – SK005605).

Contains confidential information subject to protective order

employees.[72, 73]   However, DEM Sr. does not recall the exact value of the assets transferred nor the date of the transfer to the DPM Pension Plan.[74]   Given that the DPM Pension Plan was not formed until 2000, a period when DEM Sr. was insolvent, any transfer of non-exempt assets to this plan whereby DEM Sr. did not receive reasonably equivalent value would be a fraudulent transfer.  As of January 1, 2003, the DPM Pension Plan held assets totaling $3.1 million.[75]

Based on my review of the discovery to date in this matter, I have not found any evidence that the DPM Pension Plan provided DEM Sr. any consideration for the portion of the pension liabilities of others that DEM Sr. funded as part of this transaction.   The consideration shortfall from this transfer is due to the DPM Pension Plan benefiting others who are participants in the plan.  Therefore, DEM Sr.'s transfer of this asset resulted in a transaction in which he did not receive reasonably equivalent value.

Based on my review of the limited discovery to date in this matter, I have not been able to verify the complete character and amount of the funds transferred into the DPM Pension Plan at the time of the transfer.   I will update this analysis should additional discovery be produced regarding this transfer.

---

[72] Prior to funding the DPM Pension, DEM Sr. held his Murray & Murray "qualified" assets in a rollover account because Murray & Murray had discontinued its plan (Deposition of Dennis E. Murray, Sr. 30(b)(6), pages 69 – 73).

[73] As of 2007, the participants in the DPM Pension Plan included DPM's partners as well as Mark Newman, husband of Elizabeth Newman. (DPM Defined Benefit Pension Plan and Trust Census Report January 1, 2007 through December 31, 2007 - LIB 0434).   Based on limited discovery, it is unclear who were participants in the DPM Pension Plan prior to January 1, 2007.

[74] DEM Sr. stated the transfer may have been approximately $5 million, but does not recall the specific amount (Deposition of Dennis E. Murray, Sr. 30(b)(6), page 73).

[75]  Citigroup Global Mkts Inc Statement for DPM Limited Defined Benefit Pension Plan and Trust Dennis E. Murray Sr. TTEE 5/3/00 as of December 31, 2003 (SK005747).

**Contains confidential information subject to protective order**

### 4.  Transfer of Current Wages to the Murray & Murray  401(k) plan [76]

Beginning in 2005, DEM Sr. made contributions of Murray & Murray wages into the 401(k) Retirement Plan of Murray & Murray ("Murray & Murray 401(k)").  According to the retirement plan enrollment form dated November 29, 2005, DEM Sr. wanted "to begin contributing more, to the maximum permitted by law, including catch-up contribution."[77] Between 2005 and 2007, DEM Sr. contributed $18,000, $20,000, and $20,500 in each respective year.[78]   Based on DEM Sr.'s Murray & Murray W-2 forms between 1996 and 2004, there were no contributions reported to a 401(k) plan.[79]

Based on my review of the discovery to date in this matter, I have found evidence that DEM Sr. made contributions to the Murray & Murray 401(k).  These contributions were during a period when DEM Sr. was insolvent.  To the extent that the Murray & Murray 401(k) is considered to be an exempt asset, I understand that these transactions would represent a fraudulent transfer.  Therefore, for purposes of this analysis, I have included DEM Sr.'s transfer of these wages as a fraudulent transfer.

The transfers of DEM Sr.'s current wages resulted in a fraudulent transfer of $59 thousand. In addition, I calculated prejudgment interest from the respective dates of each transfer through the date of this report using the Indiana prejudgment rate of 8% simple interest.[80] The amount of prejudgment interest is $8 thousand, resulting in a total shortfall of $66 thousand.

---

[76] DEM Sr. has not produced discovery regarding DEM Sr.'s and DPM's retirement accounts.  (Dennis Murray's Amended Resp. to Conseco's First Request for Production, Response #5)  I understand from counsel that only select retirement assets are exempt from collection of creditors based on certain legal criteria.  As a result of DEM Sr.'s failure to produce discovery related to DEM Sr.'s retirement accounts, the complete character and amount of DEM Sr.'s retirement assets is unknown.  For purpose of this analysis, I have assumed that these assets are non-exempt assets and included these assets as fraudulent transfers. Should the Court determine that these assets are exempt assets, I will adjust my analysis, as appropriate.
[77] Citistreet Retirement Plan Enrollment Form dated November 29, 2005 (SK006886 – SK006887).
[78] DEM Sr.'s W-2s for 2005 – 2007 (DEM000434, DEM000440, DEM000449).
[79] DEM Sr.'s W-2s for 1996 – 2004 (DEM000459, DEM000467, DEM000472, DEM000483, DEM000494, DEM000517, DEM000544, DEM000552, DEM000555).
[80] IC 24-4.6-1-103

Contains confidential information subject to protective order

Table 8 below provides a summary list of assets transferred and the corresponding date of each transfer.

| Table 8: Transfer of funds to M&M 401(K) Plan | | | | | | |
|---|---|---|---|---|---|---|
| Transfer | Transfer Date | Transferor | Transferee | Transfer Amount | Prejudgment Interest | Total |
| Contributions to M&M 401(k) Plan | 12/31/05 | DEM Sr. | M&M 401K | $18,000 | $3,890 | $21,890 |
| | 12/31/06 | DEM Sr. | M&M 401K | $20,000 | $2,722 | $22,722 |
| | 12/31/07 | DEM Sr. | M&M 401K | $20,500 | $1,150 | $21,650 |
| Contributions to M&M 401(k) Plan | Various | DEM Sr. | M&M 401K | $58,500 | $7,762 | $66,262 |

### 5.   Transfer of IRA to Murray & Murray 401(k) [81]

During 2000, DEM Sr. held assets in a brokerage account at McDonald & Co.[82]  In early August 2000, DEM Sr. transferred assets from his McDonald & Co. account to a Salomon Smith Barney account (11B-60166-15 261) entitled Dennis E. Murray, Sr. SSB IRA Rollover Custodian totaling $2.6 million.[83]  The assets included in this transfer were cash, certificates of deposits, and marketable securities.  Next, on September 14, 2000, DEM Sr. transferred these same assets, which totaled $2.9 million due to changes in market value, from the Salomon Smith Barney account into the Murray & Murray 401(k).[84]  In his joint 2000 federal tax return, DEM Sr. reported a non-taxable IRA distribution equaling the amount of the September 14, 2000 transfer.

Based on my review of the limited discovery to date in this matter, I have not been able to verify the complete character and amount of the funds transferred into the Murray & Murray

---

[81]  DEM Sr. has not produced discovery regarding DEM Sr.'s and DPM's retirement accounts.  (Dennis Murray's Amended Resp. to Conseco's First Request for Production, Response #5) I understand from counsel that only select retirement assets are exempt from collection of creditors based on certain legal criteria.  As a result of DEM Sr.'s failure to produce discovery related to DEM Sr.'s retirement accounts, the complete character and amount of DEM Sr.'s retirement assets is unknown.  I will update this analysis should discovery regarding this account be produced.

[82]  DEM Sr. has not produced discovery regarding his McDonald & Co. account, which limits the visibility into the complete character and amount of assets held in this account.  I will update this analysis if additional information is produced.

[83]  SK003067 – SK003076.

[84]  SK003067 – SK003076.  Between early August 2000 and September 14, 2000, it appears DEM Sr. moved the assets held as certificates of deposits into cash.

Contains confidential information subject to protective order

401(k).  I will update this analysis should additional discovery be produced regarding this transfer.

### 6.  Unexplained Cash Withdrawals

In addition to the transfers described above, I have identified a number of withdrawals from the Murrays' joint accounts that individually exceeded $10 thousand, where I could not identify the use of the funds, the recipients of those withdrawals nor the consideration that the Murrays received in exchange for those withdrawals.  The total amount of these withdrawals is $3.4 million.

The following tables outline the total annual withdrawal amounts I identified as unexplained.

Dennis E. Murray Margaret A. Murray - Dreyfus Account 124-0220695795 [85]

| Account # | 1999 | 2000 | 2001 | 2002 | 2003 | Total |
|---|---|---|---|---|---|---|
| 124-0220695795 | $479,482 | $2,419,358 | $288,788 | $10,000 | $32,790 | $3,230,418 |

Dennis E. Murray Margaret A. Murray - National City 28951

| Account # | 2000 | 2002 | Total |
|---|---|---|---|
| 28951 | $45,080 | $59,397 | $104,477 |

Dennis E. Murray Morgan Stanley 524048008

| Account # | 1999 | 2006 | Total |
|---|---|---|---|
| 524 048008 | $35,294 | $24,064 | $59,358 |

In addition, I identified on October 17, 2000, 2,800 Leucadia shares transferred from DEM Sr.'s Morgan Stanley Account 524-048008 to account 524-011502[86], whose owner is not known based on discovery to date.

---

[85] In DEM Sr.'s deposition, he indicates that the Dreyfus account (124-0220695795) was funded by him; however, DEM Sr. and MAM had access to funds within the account.  Regarding the withdrawals that occur in 2000, DEM Sr. indicated that the funds could have been used to pay bills, transferred to DEM Sr., or to MAM.  In fact, DEM Sr. agrees that the entire amount of unexplained 2000 withdrawals could have gone into MAM's personal account (Deposition of Dennis E. Murray, Sr. pages 65 - 71).

[86] Morgan Stanley Account 524-048008 dated October 2000 (MM13976).

Contains confidential information subject to protective order

## VII.    Compensation

AlixPartners is being compensated $575 per hour for my time and between $150 and $450 per hour for staff working at my direction.

## VIII.   Additional Analysis and Demonstrative Aids

I reserve the right to amend and/or supplement this report based upon any new and/or additional facts or other documents which may come to my attention, or information, including expert reports, deposition testimony and related document exhibits thereto, which may be produced.

I understand fact discovery in this matter is ongoing, therefore, I specifically reserve my ability to update and amend this report based upon additional information.

If I am called upon to testify, I may prepare demonstrative aids, such as graphs, charts or tables.

Louis G. Dudney

September 12, 2008



**Chicago**  Dallas  Detroit  Düsseldorf  London  Los Angeles
Milan  Munich  New York  Paris  San Francisco  Shanghai  Tokyo

# CURRICULUM VITAE
## OF
## LOUIS G. DUDNEY, CPA

| | |
|---|---|
| **POSITION** | Managing Director, Financial Advisory Services Practice, Co-Head of Case Management Services Practice, AlixPartners, LLP |
| **EDUCATION** | College of William and Mary, B.B.A. in Accounting |
| **PROFESSIONAL CERTIFICATIONS/ BUSINESS AFFILIATIONS** | Certified Public Accountant - Illinois<br>American Institute of Certified Public Accountants<br>Illinois Society of Certified Public Accountants<br>Member - Licensing Executives Society, American Bankruptcy Institute, Turnaround Management Association |
| **RANGE OF EXPERIENCE** | Mr. Dudney's experience covers broad types of transaction, litigation, valuation, bankruptcy and management consulting engagements, including mergers & acquisitions, intellectual property valuation and dispute resolution, solvency analysis, breach of contract and lost profits analysis, insurance dispute resolution, environmental claim analysis, and accounting malpractice and pronouncements misapplication. |

Further, as part of working with financially and/or operationally challenged businesses, Louis assists companies stabilize liquidity crises, implement management and operational changes to improve cash flow, and negotiate with creditors to restructure the balance sheet.  In addition to working on behalf of companies, Louis is also retained by creditors to provide support in analyzing credit decisions and evaluating alternative restructuring plans.

Prior to joining AlixPartners, LLP, Mr. Dudney was a partner with PricewaterhouseCoopers in its Financial Advisory Services Group. Mr. Dudney has consulted with companies in a number of industries including retail, computer design, specialty chemicals, real estate, financial services, healthcare, construction, entertainment, telecommunications, manufacturing, energy, and consumer products. In performing engagements in these industries, he has analyzed economic, accounting and financial issues and testified in Federal Civil, Bankruptcy and State Courts as well as American Arbitration Association hearings and state regulatory proceedings as an expert witness.



**LOUIS G. DUDNEY, CPA**
**Page 2**

**SELECTED**
**ENGAGEMENTS**

- Retained by a merchant power generator to perform a series of valuations as of different points in time historically and determine damages associated with alleged fraudulent conveyance claims of over $1 billion.  As part of this assignment, analyses of the company's financial solvency were performed.  In addition, numerous power plant acquisitions and financing deals were analyzed to determine if the company obtained reasonably equivalent value in the deals it undertook.

- In a bankruptcy litigation matter, retained by a large telecommunications equipment manufacturer to analyze over $100 million in potential preferences, evaluate the solvency of the debtor at various dates historically, and perform tests regarding capital structures and reasonably equivalent value related to claimed fraudulent conveyances in excess of $3 billion.

- Retained in a bankruptcy dispute regarding a hardware retail store chain.  As part of this assignment, performed a valuation of the company at various points in time to determine solvency.  Additionally, individual store performance, land values and inventory levels were analyzed.

- In a bankruptcy litigation matter retained by a food distribution company to analyze potential fraudulent conveyances related to several acquisitions that occurred prior to its Chapter 11 filing.  As part of this assignment, multiple valuations of the debtor were performed.  In addition, analyses of capital adequacy and reasonably equivalent value were also performed.

- Retained in the bankruptcy of a retail conglomerate to value the entity, and evaluate the solvency and reasonably equivalent value of several transactions.

- In a venture capital transaction, determined the damages associated with fraudulent financial information provided prior to the sale of a software company.  This required analysis of corporate financial statements, independent accountants' workpapers and other financial disclosures.

- In a leveraged buyout transaction that resulted in litigation, analyzed the consideration and associated deal terms of the original transaction and developed a valuation of the subject company assuming the deal was unwound.



**LOUIS G. DUDNEY, CPA**
**Page 3**

**SELECTED
ENGAGEMENTS
(Continued)**

- For a baking food products company, retained to evaluate the factors contributing to the ultimate failure of the business and to determine the likelihood of survival under a number of alternative financing scenarios for purposes of determining shareholder damages.

- Retained by a metal stamping, plastic blow molding and propane cylinder manufacturer to negotiate a restructuring of its balance sheet with its principal lenders. This engagement included providing valuations of the company based on various scenarios and deal structures. Conducted negotiations with its lenders.

- In a breach of contract matter, retained by a medical products distributor to analyze the damage claims made by a new business venture partner. As part of this engagement, analyses of budgets, projections and forecasts were conducted. In addition, incremental lost revenues and avoided costs were investigated.

- For a national trucking and logistics firm, retained to provide a valuation as part of a series of disputed transactions. As part of this engagement, a comprehensive comparable company analysis was performed in addition to a discounted cash flow analysis.

- Retained by a foreign automobile manufacturer to determine the reasonable royalty related to an alleged infringement of a patent for the control of fuel consumption. This analysis included a review of comparable licenses, production alternatives, industry pricing history and allocation of profits between various automobile parts.

- For the sale of a subsidiary related to interactive television, retained to value specific rights and property being conveyed from the seller to the purchaser. This valuation included reviews of the markets for interactive television, evaluation of relevant license agreements and development of financial models to determine the present value of selected technologies.

- Retained by a bond insurer to value a major telecommunications services provider in relation to a refinancing plan contemplated by the company.



**LOUIS G. DUDNEY, CPA**
**Page 4**

**SELECTED**
**ENGAGEMENTS**
**(Continued)**

- Retained by a manufacturer of digital television technology to value a portion of its technology portfolio. This engagement included the development of sophisticated real-options valuation analyses to account for the uncertainty of identified future decisions that would impact value. Discounted cash flow analyses and market comparable analyses were used as part of creating the valuation report.

- Retained by a large electrical contractor to analyze its operations, review the status of its projects, cost overruns and claims. As part of this assignment, analyses of individual construction contracts were conducted to determine the financial status of claims, project profitability and future expected cash outflows.

- For a caisson and foundation building company, retained by the bank group in a workout to analyze the status of various ongoing construction projects and document and trace the flow of funds for selected transactions between numerous operating entities. This assignment included analyses of financial reporting, intercompany transactions, bank account activity, investment transactions and payments to third parties.

- For an automobile joint venture, retained to evaluate the factors contributing to the failure of the business. As part of this assignment, analyses of liquidity, working capital, historical financial performance and profitability were conducted.

- Retained by a bank group to analyze the operating and financial performance of a troubled steel company. As part of this engagement, assisted the bank group in evaluating and developing alternative restructuring plans including out-of-court v. Chapter 11 options, valuing the subject company, analyzing operating performance, monitoring liquidity and forecasting the company's ability to continue operations. Additionally, participated in negotiations regarding the future options for the business with various stakeholders including equity, employee unions, government oversight and various lender groups.

- Retained by a major candy manufacturer to evaluate a damage claim submitted by a supplier alleging lost profits caused by a breach of contract. This matter required an analysis of customer purchasing activity, production capacity, sales volumes and customer contracts.



**LOUIS G. DUDNEY, CPA**
**Page 5**

**SELECTED**
**ENGAGEMENTS**
**(Continued)**

- Retained by a major consumer products manufacturer to investigate an employee kickback scheme associated with alleged under-market contracts being provided to transportation carriers in exchange for cash and other asset payments.

- Retained by a major commodities broker/dealer to investigate the alleged theft of corporate assets and fraudulent accounting associated with transactions totaling several billion dollars.  As part of this investigation, analyses of intercompany transactions, debt financings, a leveraged buyout, and an initial public offering were conducted.

- Retained by a large construction contractor to analyze a $4 billion construction damages claim alleged by the owners of 6 large nuclear power plants.  As part of this assignment, reviewed project financing and cost documents, project operational data and consumer pricing to determine the value of the alleged claims.

- As part of a post acquisition purchase price dispute, retained by a Fortune 500 electrical equipment manufacturer to analyze a variety of accounting issues for both working capital adjustment and fraud claims.  As part of this assignment, analyses of accounts receivable, accounts payable, inventory, revenue and EBITDA were performed.

- For a real estate limited partnership, retained to opine on a HUD audit of operations, cash flows and transactions related to inappropriate payments between identity-of-interest companies and the Management Agent.  This analysis included reviews of compliance audits and analyses of transactions between several layers of limited partnerships.

- Retained by an international insurance and financial services firm to coordinate the financial investigation of the former CEO and CFO related to over $100 million in loans taken from the company.  This assignment included the analysis of personal financial information, bank statements, brokerage statements, investments and other transactional documentation.  Additionally, assisted in the negotiation and execution of out-of-court settlement agreements to repay certain funds due.



**LOUIS G. DUDNEY, CPA**
**Page 6**

**SELECTED**
**ENGAGEMENTS**
**(Continued)**

- For a specialty steel manufacturer, retained to calculate the economic loss from an interruption in business caused by an equipment failure. As part of this engagement, lost revenues were calculated as well as costs incurred or saved as a result of the equipment failure. The analysis performed resulted in a calculation of the profits lost due to the business interruption.

- For a graphics processor manufacturer, retained to evaluate the factors contributing to the failure of the business. As part of this assignment, analyses of profitability, financing, and projected financial performance were conducted.

- For a metal reclamation company, retained to calculate lost profits as a result of an alleged breach of contract. Lost profit and extra expense analyses were performed. Reviews of the company's historical financial performance were conducted to estimate future performance assuming the breach had not occurred.

- For an integrated steel producer, retained to analyze the operations of a division that was experiencing financial distress. As part of this assignment, facility utilization, product pricing, distribution and sales channels were analyzed to identify opportunities for cost savings and EBITDA improvement.

- Retained by a bond insurer to develop alternative restructuring plans for a major utility. This engagement included analyzing the company's ability to meet future debt obligations, comparing a planned equity rights offering to an outright sale of selected businesses, evaluating various Chapter 11 bankruptcy scenarios and valuing selected business units.

- Retained by a major ERP software manufacturer to analyze costs and damages claimed by a customer regarding a failed implementation claim. As part of this assignment, incremental costs, value offsets and damages were analyzed.

- In a copyright and trademark dispute, retained to evaluate the damages incurred, including dilution and diminution of value to the subject marks and names, related to a leading brand of sales training courses. As part of this assignment consumer confusion and pricing issues were analyzed.

- Retained by a prepared food business to analyze the accounting for its trade promotions and allowance program as part of a mergers and acquisition dispute with the business' prior owner.



**LOUIS G. DUDNEY, CPA**
**Page 7**

**SELECTED**
**ENGAGEMENTS**
**(Continued)**

- In an employee termination dispute, analyzed the profitability of a high tech maker of application specific integrated circuits to determine the appropriate payout to a former employee.  As part of this analysis, the books and records of the company were analyzed to determine the profitability associated with selected products.  Moreover, product line financial statements were constructed, cash flows were traced and historical payment activity was analyzed.

- In a theft of trade secrets case, retained by a mail order retailer to assist in analyzing both liability and damages resulting from the alleged theft of its mailing list.  As part of this assignment, historical mailing lists, data extracts regarding mailing levels and success rates were utilized to analyze liability.  In addition, an event study was performed to demonstrate the impact of the alleged misappropriation.

- Retained by a property & casualty insurance company to opine on the appropriateness of claims submitted by the insured in an insurance coverage matter.  As part of this engagement, analyzed financial data submitted in support of the claim and determined the appropriate claim amounts.

- Retained by the owners of a cold storage warehouse to quantify the profits lost for a business interruption claim dispute with their insurers.  As part of this engagement, extensive analyses of operational statistics were prepared.  In addition, expenses associated with the business interruption were analyzed for inclusion in the claim.

- Retained by a property & casualty insurance company to review the claims experience and flow of funds (both indemnity and premium payments) associated with certain occurrence and claims made policies.  Constructed a financial model to estimate the value of selected claims applied to the appropriate underlying policies.

- Retained by an equipment manufacturer in an environmental clean-up cost action to assess future liabilities as a result of alleged PCB ground contamination from thousands of valves used along a large natural gas pipeline.  This required the use of a probabilistic decision tree model to project future expected liabilities.  This model incorporated expectations of future legislative changes, contamination levels and alternative remediation methods.



**LOUIS G. DUDNEY, CPA**
**Page 8**

---

**SELECTED**
**ENGAGEMENTS**
**(Continued)**

- Retained in a cost contribution action to determine the quantity of agricultural chemicals shipped to a pesticides processing facility, processed and shipped to retail resellers. This engagement required review of over 20 years of historical volumetric data, production information and proposed allocations. Over $20 million in remediation costs were incurred in relation to this site.

- Retained in a product liability suit in the candy industry to determine the lost profits that resulted from defective wrappers used in the production process. This engagement included analyses of historical financial and operational performance measures to determine if any profits were lost. In addition, analyses were conducted to determine the incremental financial impact to the manufacturer from the sale of the tainted products.

- In thirteen related dealership/franchise termination cases, retained by a Fortune 500 company to perform extensive analyses of each dealer/franchisee's performance, the performance of comparable dealers/franchisees, analyses of territory changes and ultimate determinations of damages incurred. In addition, performed analyses of the financial condition of the dealer/franchisee, prior to the formation of the dealership/franchise, to determine suitability and identify incremental benefits compared to prior business performance.

- Retained by a major insurance broker to individually calculate, process, and pay rebates due to thousands of customers as a result of a $200 million dollar settlement with state officials.

- Retained by a large insurance company to evaluate brokerage and claim payments made as part of an employee health insurance plan reinsurance dispute. This engagement included analyses of bordereaux, excess loss calculations, ceded premium and brokerage fees paid.

- For a national food distributor, retained to evaluate and opine on damages related to the operation and delivery of food to a variety of quick serve and related restaurant operations. Analyses of the financial and operating performance of individual stores, franchise groups, buying cooperatives and company owned stores for a variety of operations including Burger King, Sonic, Chili's, TGI Fridays, Sbarros and Applebees were performed.



**LOUIS G. DUDNEY, CPA**
**Page 9**

**SELECTED**
**ENGAGEMENTS**
**(Continued)**

- Retained by a health insurance company to evaluate the accounting treatment of various balance sheet and income statement accounts related to an earn-out provision of a merger & acquisition dispute. This assignment included determining the appropriate GAAP treatment for various transactions and recalculating EBITDA applicable to the earn-out.

- In a post acquisition purchase price and breach of contract dispute, valued the equity of an international health and fitness business.

- Retained in a large Chapter 11 filing to evaluate financing options and restructure over $50 million in lease financed assets. As part of this work, assisted the debtor source new financing options, negotiate restructured lease agreements and evaluate historical and future operating costs.

- For a value added reseller of advanced machining technology, retained to advise the company regarding valuation and deal structuring issues related to the potential sale of the company.

- For a regional bell operating company, retained to evaluate and opine on the valuation methodology used to negotiate a transaction to sell selected wireless communications technology with a lease back to the seller. This engagement included both an evaluation of the technology being sold as well as an analysis of the incremental value obtained by completing the transaction.

- In a post acquisition purchase price dispute, retained by a safety products company to analyze the impact to EBITDA and the resulting purchase price paid of a variety of accounting restatements.

- Retained by a national distributor and rebuilder of machine tools to analyze its operations and financial status related to downturns in its performance. Additionally, assisted the company with analyzing its construction contracts, cost of completion accounting methodology, cost cutting efforts, renegotiating covenants related to its bank debt and performing due diligence related to a liquidity improving acquisition.

**Louis G. Dudney, CPA**
**Summary of Trial and Deposition Testimony in Last Four Years**

*Ha-Lo Industries, Inc., et al., v. John R. Kelley, Jr.*, United States Bankruptcy Court for the Northern District of Illinois, Eastern Division.

*Chicago Printing Company v. Heidelberg, USA.,* United States District Court for the Northern District of Illinois, Eastern Division.

*Puritan-Bennett Corp. and Mallinckrodt, Inc. v. Penox Technologies and Essex Industries, Inc.,* United States District Court for the Southern District of Indiana, Indianapolis Division.

*Argenta Finance, LTD. v. Bellsouth Enterprises, Inc.*, Commercial Arbitration

*Honeywell International, Inc., et al., v. Air Products and Chemicals.* In the Court of Chancery for the State of Delaware in and for New Castle County.

*Bentley Specialties, Inc. v. Score Acquisitions Corp., d/b/a Cody-Kramer Imports and F&F Foods, Inc.* In the Circuit Court of Cook County, County Department, Law Division.

*Expeditors International of Washington, Inc., et al. v. Vastera, Inc. and Jennifer Sharkey.* United States District Court, Eastern District of Michigan.

*Richard Snyder, et al. v. Thomas and Betts Corporation,* United States District Court for the Northern District of Illinois, Eastern Division.

*Michael J. Lisle, et al. v. Health Communications Services, Inc., et al.*, In the Circuit Court of Cook County, Chancery Division.

*Aon Re, Inc. v. RGA Reinsurance Company,* United States District Court for the Northern District of Illinois, Eastern Division.

*Facility Capital Corporation, et al. v. Centerpoint Equipment Capital Corporation, et al.* American Arbitration Association.

*Maytag Corporation v. Whirlpool Corporation*, United States District Court for the Southern District of Iowa, Central Division.

*Nexans Wires S.A. and Lacroix & Kress Gmbh v. Sark-USA, Inc. and Sarkuysan Elektrolitik Bakir Sanayii Ve Ticaret A.S.,* United States District Court for the Southern District of New York.

*Statutory Committee of Unsecured Creditors on Behalf of Iridium Operating LLC, et al. v. Motorola, Inc.*, United States Bankruptcy Court, Southern District of New York.

**Exhibit 1**
Page 1

**Louis G. Dudney, CPA**
**Summary of Trial and Deposition Testimony in Last Four Years**

*Larry F. Robb, Individually, in Behalf of a Class of Minority Shareholders of 3CI Complete Compliance Corp., and Derivatively in Behalf of 3CI Complete Compliance Corp., v. Stericycle, Inc., et al.* First Judicial District Court, Caddo Parish, Louisiana.

*Paul Oravec v. Sunny Isles Luxury Ventures L.C., et al.,* United States District Court, Southern District of Florida.

*Zimmer Technology, Inc. and Zimmer, Inc. v. Howmedica Osteonics Corp.,* United States District Court, Northern District of Indiana, South Bend Division.

*Robotic Workspace Technologies, Inc. v. ABB Inc. and ABB Automation Technologies AB,* United States District Court for the Middle District of Florida.

*S.C. Johnson & Son, Inc. v. Milton E. Morris, et al.,* State of Wisconsin, Circuit Court, Racine County.

*IMG Worldwide, Inc. v. Casey Close,* American Arbitration Association.

*Refco, Inc. et al.,* United States Bankruptcy Court, Southern District of New York.

*Cruz, et al. v. Wal-Mart Stores, Inc.,* Superior Court of the State of California, County of Los Angeles, Central District.

*Orthoarm, Inc., and G.A.C. International, Inc.  v. Forestadent USA, Inc. and Dyna Flex.* Ltd., United States District Court, Eastern District of Missouri, Eastern Division.

*Conseco Services, LLC v. James D. Massey and Margaret E. Massey*, State of Indiana, Hamilton Superior Court

In the Matter of the Ad Hoc Arbitration between *Sears, Roebuck and Co. and Computer Sciences Corp.*, New York

*KIK International, Inc. v. Satish Shah, et al.,* American Arbitration Association, Chicago, IL.

*Marquette Ventures Partners II, L.P.; MVP II Affiliates Fund, L.P. v. Frank M. Leonesio and Melissa Leonesio, et al.,* Superior Court of the State of Arizona, County of Maricopa

*Bayer Clothing Group, Inc. v. Sears, Roebuck & Co.*, United States District Court for the Northern District of Illinois, Eastern Division

*Hospira, Inc. et al., v. The BOC Group, Inc., et al.,* Circuit Court of the Nineteenth Judicial Circuit, Lake County, Illinois

**Exhibit 1**
Page 2

SUMMARY OF PUBLICATIONS


"Has Our 500-year-old Accounting System Finally Met Its Match in the New Economy",
The Journal of Corporate Renewal. Vol. 13/No. 5.  May 2000.

Exhibit 2

*Conseco Services, L.L.C. vs. Dennis E Murray ("DEM Sr.")*
**List of Documents Reviewed and/or Relied Upon**

| Prefix | From | To | Prefix | From | To | Other Documents |
|--------|------|-----|--------|------|-----|-----------------|
| C | 07908 | 07912 | MM | 013542A | 013542A | Legal Filings |
| C | 07962 | 07965 | MM | 015881A | 015881A | Correspondence |
| C | 69351 | 69381 | MM | 015885A | 015886A | Deposition of Dennis E. Murray Sr., 8/12/2008 |
| C | 74715 | 74784 | MM | 015888A | 015890A | Deposition of Dennis E. Murray Sr., 8/13/2008 |
| C | 74786 | 74897 | MM | 015899A | 015900A | Deposition of Dennis E. Murray sr. 30(b)(6), 8/14/2008 |
| C | 74906 | 75018 | MM | 015902A | 015902A | Deposition of Dennis E. Murray Jr., 7/28/2008 |
| C | 102515 | 102517 | MM | 015906A | 015908A | Deposition of Dennis E. Murray Jr. 30(b)(6), 7/29/2008 |
| CB | 0001 | 0003 | NCB-MUR | 00001 | 00450 | Deposition of Margaret A. Murray, 8/12/2008 |
| CON | 33306 | 33310 | OBR | 000001 | 000128 | Deposition of Michael J. O'Brien, 7/1/2008 |
| CSB | 0001 | 0142 | SC | 0001 | 0009 | Deposition of James P. Sacher, 6/30/2008 |
| DEM | 000001 | '000568 | SK | 000001 | 000436 | Deposition of Daniel V. Vassallo, 7/28/2008 |
| DPM-NC | 000001 | 000025 | SK | 000439 | 001892 | DEM Balance Sheet, 9/16/1999 |
| LIB | 0001 | 0470 | SK | 001921 | 001926 | DEM Balance Sheet, 12/15/2000 |
| ML | 00001 | 00294 | SK | 001928 | 001945 | DEM Balance Sheet, 12/18/2001 |
| MM | 000560 | 000651 | SK | 002331 | 002352 | DEM Balance Sheet, 1/20/2003 |
| MM | 000657 | 000700 | SK | 002397 | 002602 | Bloomberg - Conseco High Price |
| MM | 000708 | 000714 | SK | 002604 | 002771 | Bloomberg - Conseco |
| MM | 000718 | 000761 | SK | 002773 | 002815 | Bloomberg - Leucadia |
| MM | 000895 | 001158 | SK | 002820 | 003489 | Bloomberg - First Citizens |
| MM | 001160 | 001381 | SK | 003543 | 005305 | Conseco 8-K 12/17/02 |
| MM | 001383 | 001493 | SK | 005308 | 005682 | www.murrayandmurray.com/Bio/DennisMurray1.asp |
| MM | 001520 | 001520 | SK | 005704 | 005722 | Director and Officer Loans Conseco Services LLC |
| MM | 001530 | 001654 | SK | 005725 | 005725 | |
| MM | 001676 | 001707 | SK | 005727 | 005741 | |
| MM | 001759 | 001759 | SK | 005819 | 006194 | |
| MM | 001761 | 001762 | SK | 006196 | 006470 | |
| MM | 001764 | 001805 | SK | 006483 | 006510 | |
| MM | 001807 | 001877 | SK | 006512 | 006539 | |
| MM | 001897 | 001918 | SK | 006541 | 007008 | |
| MM | 001923 | 002342 | SK | 007011 | 007012 | |
| MM | 002347 | 002544 | SK | 007014 | 007014 | |
| MM | 002547 | 002558 | SK | 007016 | 007136 | |
| MM | 002560 | 002561 | SK | 007266 | 007440 | |
| MM | 002566 | 002862 | SK | 007442 | 007458 | |
| MM | 002864 | 003039 | SK | 007467 | 007485 | |
| MM | 003331 | 003356 | SK | 007506 | 007571 | |
| MM | 003655 | 003976 | SK | 007594 | 007610 | |
| MM | 003984 | 004037 | SK | 007626 | 007636 | |
| MM | 004048 | 004080 | SK | 007656 | 007666 | |
| MM | 012636 | 013876 | SK | 007664 | 007797 | |
| MM | 013883 | 016594 | SK | 008168 | 008351 | |
| MM | 017509 | 018601 | SK | 008355 | 008355 | |
| MM | 018654 | 018699 | SK | 008358 | 008582 | |
| MM | 018751 | 018979 | SK | 008584 | 008593 | |
| MM | 023343 | 023346 | SK | 008600 | 008733 | |
| MM | 012664A | 012664A | SK | 008735 | 008757 | |
| MM | 012677A | 012677A | SK | 007452A | 007458A | |
| MM | 012684A | 012684A | | | | |
| MM | 012688A | 012688A | | | | |
| MM | 013538A | 013539A | | | | |

Exhibit 3
Page 1