| | |
|---|---|
| PRICE WAICUKAUSKI & RILEY, LLC, | ) |
| | ) |
| Plaintiff/Counter-Defendant, | ) |
| | ) |
| vs. | ) Cause No. 1:10-cv-1065-WTL-TAB |
| | ) |
| DENNIS E. MURRAY, SR., | ) |
| MARGARET A. MURRAY, and | ) |
| DPM, LTD., | ) |
| | ) |
| Defendants/Counter-Claimants. | ) |

## ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Before the Court are the parties' cross-motions for summary judgment (dkt. nos. 99, 118). The motions are fully briefed, and the Court rules as follows.

## I.   STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not

required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

The fact that the parties have filed cross-motions for summary judgment does not alter the standard set forth in Federal Rule of Civil Procedure 56. When evaluating each side's motion, the Court simply "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Metro Life. Ins. Co. v. Johnson*, 297 F.3d 558, 561-62 (7th Cir. 2002) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

## I.     BACKGROUND

This case was filed in August 2010 by the Plaintiff, Price Waicukauski & Riley, LLC, ("PWR") against the Defendants, Dennis and Margaret Murray and DPM, Ltd. ("DPM"), to recover over $125,000 in attorneys' fees owed to PWR. The attorneys' fees stem from PWR's representation of the Murrays[1] in a rather contentious lawsuit[2] against Conseco, Inc. ("Conseco") and Conseco Services, LLC ("Services") that spanned more than six years. Ultimately, the case settled. Unhappy with PWR's representation, in November 2010, the Murrays filed a counterclaim against PWR alleging legal malpractice. The present cross-motions for summary judgment address both sides' claims.

A brief recitation of the relevant facts pertaining to the Underlying Litigation, the allegations of PWR's legal malpractice, and the outstanding attorneys' fees still owed by the Murrays follow. Additional relevant facts will be provided in the Discussion section below.

---

[1] For simplicity's sake, for the duration of this Entry, when the Court refers to "the Murrays," it is referring to Dennis Murray, Margaret Murray, and DPM.

[2] The Court will refer to this lawsuit as the "Underlying Litigation" throughout this Entry. The cause number for the Underlying Litigation is 1:03-cv-1701-LJM-JMS (S.D. Ind. filed Nov. 14, 2003). Citations to docket entries found in this cause number will be cited as "UL dkt. no. —."

## A. Facts Leading to the Underlying Litigation

Mr. Murray served as a member of Conseco's Board of Directors from 1994 to 2000. He is also the general partner of DPM, an Ohio limited partnership. At some point during the late 1990s and early 2000s, Mr. Murray and DPM participated in Conseco's Director and Officer Loan Program ("the D&O program"). This allowed directors and officers to purchase Conseco stock by borrowing large sums of money from certain banks. Conseco guaranteed the loans, and Services paid the interest on the loans. Mr. Murray and DPM executed numerous documents in conjunction with this agreement—Participation Agreements, Credit Agreements, Promissory Notes, etc.—but all essentially boiled down to the fact that as borrowers, they promised to repay the loan and/or reimburse Conseco if Conseco paid the banks pursuant to its guaranty agreement. In all, Mr. Murray borrowed $41,618,499.03 from the banks, and DPM borrowed $58,002,106.52. They also borrowed over $30 million from Services.

Unfortunately, in the late 1990s, Conseco began to experience financial difficulties; it eventually filed for Chapter 11 bankruptcy in December 2002. This was considered an event of default; therefore, the loans were automatically accelerated and became immediately due. As part of its reorganization plan, Conseco paid the banks, pursuant to its guaranty agreement, with new debt and stock rather than cash. Accordingly, the banks transferred their rights under the loans to post-reorganization Conseco. Conseco was then able to seek $99 million for the principal on the loans from the Murrays; additionally, Services sought recovery of $30 million paid in interest on the loans.

## B. The Underlying Litigation

In November 2003, Mr. Murray and DPM sued Conseco and Services in this court. Their complaint alleged nine counts, including several claims for declaratory judgment, rescission, and

fraud. While numerous other lawsuits were filed in other courts, this lawsuit served as the "primary venue" for the Murrays' disputes with Conseco and Services. The case lasted for six years and resulted in various motions filed by both sides, orders from the district court judge, and an appeal to the Seventh Circuit. By July 2009, the Murrays had no remaining claims against Conseco or Services that survived summary judgment; therefore, they reached an eventual settlement—$5.8 million to be paid by the Murrays to Conseco and Services. The Murrays were represented by PWR throughout the entire case and paid the firm over $2.7 million in attorneys' fees.

### C. PWR's Claim for Outstanding Attorneys' Fees

Beginning in November 2009, PWR sent the Murrays a bill for outstanding attorneys' fees. It sent similar bills in December 2009 and February 2010; however, the Murrays never paid. To date, $127,592.91 has been billed and not paid. PWR's sole claim against the Murrays in the instant lawsuit seeks to recover these fees.

### D. The Murrays' Claims for Legal Malpractice

As a result of its representation in the underlying lawsuit, the Murrays have asserted a legal malpractice claim against PWR. Their eight allegations are briefly summarized below.

#### 1. PWR's Conflict of Interest

In October 2002, PWR agreed to serve as local class counsel for a class of ERISA plaintiffs in "the Russell action."[3] The plaintiffs in the Russell action filed suit on behalf of themselves and other purchasers of Conseco stock as participants in Conseco's ConsecoSave Plan. The suit was filed against Conseco, Services, and John Does 1-30, and alleged that the defendants breached their fiduciary duties by, among other things, misrepresenting and failing to

---

[3] *Russell, et al. v. Conseco, Inc., et al.*, 1:02-cv-1639-LJM-WTL (S.D. Ind. filed Oct. 24, 2002).

disclose material facts.  The relevant time period for the class action was April 1999 through September 2003—a time in which Mr. Murray was on Conseco's Board of Directors.

PWR recognized that representing Mr. Murray in the underlying lawsuit while serving as local class counsel in the Russell action could potentially cause a conflict of interest.  Therefore, it conducted its own research on the potential conflict, but it concluded that there was no direct conflict.  While PWR asserts it obtained oral consent from Mr. Murray to the concurrent representation, it is undisputed that no written consent was ever obtained.  Mr. Murray asserts he had no knowledge of the Russell action and did not consent to any concurrent representation.

Eventually, the Russell action settled for $9.75 million in October 2005.  During the course of the Russell action, Conseco sought coverage from its insurance company, RLI, for its defense costs.  As a result, this led to another lawsuit: "the RLI action."[4]  The Murrays succinctly describe the relevant factual background of the RLI action as follows in their brief:

> Murray and Conseco had given [releases] to RLI in the Conseco Securities litigation, in which they agreed to indemnify RLI if RLI was later required to incur expenses because of further claims made against Conseco arising out of the same conduct complained of in the Conseco Securities litigation.  In the subsequent Russell [] action, PWR sought damages against Conseco arising out of the same conduct as that complained of in the Conseco Securities litigation.  After Russell was commenced, Conseco sought indemnity from RLI.  RLI incurred attorney fees as a result of Conseco's demand and then sued Murray and Conseco pursuant to the releases given in the Conseco Securities litigation.  Murray retained PWR to defend him from the causes of action of RLI.

Murrays' Reply at 38.  Eventually, the RLI action settled; pursuant to the settlement agreement, all claims against Mr. Murray were dismissed in July 2007.  It is undisputed that two PWR attorneys withdrew from representing Mr. Murray in the RLI action because they were identified as witnesses due to their involvement in the Russell action.  The Murrays allege that the conflict

---

[4] *RLI Insurance Co. v. Conseco, Inc., et al.*, 1:04-cv-310-LJM-WTL (S.D. Ind. filed Feb. 13, 2004).

of interest—simultaneous representation of both the Murrays and the plaintiffs in the Russell

action—"put at risk" PWR's representation of them in the Underlying Litigation. For example,

the Murrays allege that Mr. Murray could have been a potential defendant and thus liable for

damages in the Russell action, that the plaintiffs' interest in the Russell action were contrary to

Mr. Murray's interest in the Underlying Litigation, that Mr. Murray was a potential witness in

the Russell action, that both Mr. Murray and the plaintiffs in the Russell action were competing

for limited resources, and that the Russell action gave rise to further litigation against Mr.

Murray (the RLI action). *See* Murrays' Br. at 57-62.

>    2.  *PWR's Failure to Properly Plead Federal Subject Matter Jurisdiction*

The facts relevant to this allegation are set forth in an opinion resolving an appeal of the

Underlying Litigation:

> On October 9, 2003, Dennis E. Murray and James D. Massey filed suit against
> Conseco, Incorporated, Conseco Services, L.L.C., Merrill Lynch & Co., Inc.,
> PricewaterhouseCoopers, LLP, Bank of America, N.A., and JP Morgan Chase
> Bank. Plaintiffs invoked 28 U.S.C. § 1331 as the basis for federal subject matter
> jurisdiction. On November 14, 2003, plaintiffs filed a voluntary notice of
> dismissal under Fed. R. Civ. P. 41(a).
>
> On the same day, plaintiffs filed the instant action against only Conseco,
> Incorporated and Conseco Services, L.L.C. ("Conseco Entities"). On May 16,
> 2005, plaintiffs were granted leave to file a first amended complaint. . . . Like its
> predecessors, the first amended complaint asserted 28 U.S.C. § 1331 as the basis
> for jurisdiction.
>
> On July 15, 2005, Conseco Entities moved to dismiss the first amended complaint
> with prejudice under Fed. R. Civ. P. 12(b)(6). In Conseco Entities' motion, they
> questioned the court's subject matter jurisdiction.
>
> On September 22, 2005, plaintiffs filed a "notice of consent to dismiss first
> amended complaint" in which they conceded that the district court lacked subject
> matter jurisdiction.
>
>                                    . . .

Also on September 22, 2005, plaintiff Murray filed a motion for leave to file a second amended complaint in which he brought the same claims as those he filed in the original complaint, however, upon the basis of diversity jurisdiction rather than federal subject matter jurisdiction.

On September 26, 2005, Conseco Entities filed an opposition to plaintiffs' motion for leave to file a second amended complaint. In this motion, Conseco Entities asked the district court to dismiss the case with prejudice, arguing that plaintiffs' "notice of consent to dismiss first amended complaint" was a voluntary dismissal subject to the two-dismissal rule set forth in Fed. R. Civ. P. 41(a)(1).[5]

. . .

On December 13, 2005, the district court [] determined that the court lacked subject matter jurisdiction and [] concluded that the dismissal triggered the two-dismissal rule of Rule 41(a)(1).

*Murray v. Conseco, Inc*., 467 F.3d 602, 603-04 (7th Cir. 2006). That dismissal was appealed and the Seventh Circuit reversed, noting that "[w]hen a plaintiff alerts the court that it lacks jurisdiction to hear his case, he is not necessarily invoking Rule 41(a)(1)." *Id*. at 605. The Underling Litigation thus proceeded. In their present legal malpractice suit, the Murrays argue that they had to incur unnecessary fees as a result of PWR's failure to plead subject matter jurisdiction twice, which required an appeal to be filed to revive the case.

### 3. *PWR's Failure to Properly Handle the Murrays' Claim in the Conseco Bankruptcy*

As noted above, Conseco filed bankruptcy in 2002. PWR filed an objection on behalf of the Murrays arguing that the banks' assignment of the loans to "reorganized Conseco" was invalid because Mr. Murray did not provide his consent as required by the agreements he signed with the banks. Accordingly, PWR argued that reorganized Conseco lacked standing to enforce the loans; however, PWR subsequently withdrew that objection. In return, the Murrays and

---

[5] Fed. R. Civ. P. 41(a)(1) provides, in relevant part, that "if the plaintiff previously dismissed any federal- or state-court action based on or including the same claim, a notice of dismissal operates as an adjudication on the merits."

Conseco entered into a stipulation that preserved the Murrays' defenses of setoff, recoupment, and other defenses in the Underlying Litigation despite the bankruptcy; this stipulation has now been described as "worthless" because "this reservation of right to pursue fraud through setoff or recoupment was ineffective to avoid the bankruptcy discharge." Tidmarsh Report at 14. The Murrays claim that PWR "failed to sufficiently analyze the claims in the context on the Conseco bankruptcy . . . [and] eliminated [] the best opportunity to have successfully represented [them]" Murrays' Br. at 88.

4. *PWR's Failure to Take Depositions and Conduct Discovery as Instructed by the Murrays*

The Murrays claim that PWR failed to take a number of depositions of major figures involved in Conseco and the D&O program. In addition, they allege that they instructed PWR to serve third-party subpoenas to obtain discovery, but that PWR failed to do so.

5. *PWR's Failure to Pursue a Cause of Action for Promissory Estoppel*

Pursuant to a provision in the D&O program ("the Change of Control Provision"), Conseco was obligated to repurchase all shares bought by the Murrays and DPM in the event of a change of control of the company. However, in November 2009, Steve Hilbert, founder of Conseco, asked Mr. Murray to sign a form eliminating the Change of Control Provision from the D&O program; in return, Hilbert agreed that Conseco would ensure that no one lost any money, essentially taking all of the risk out of the investment. Obviously, this promise was not kept, as Conseco and Services sued the Murrays and DPM for the principal and interest they paid on the loans. The Murrays argue that this promise, and subsequent reliance, could have served as the basis for a promissory estoppel claim; however, PWR never brought the claim.

*6. PWR's Failure to Pursue the Murrays' Claim for Breach of Fiduciary Duty*

On April 23, 2009, PWR filed a motion for leave to amend the second amended complaint; specifically, PWR wanted to add two claims, one of which was a claim for breach of fiduciary duty. Likely fearing that the motion would be denied due to its untimeliness—the case had been pending for six years at this time—PWR also argued that adding the breach of fiduciary duty claim essentially just reasserted a count in the original counterclaim in the case that was consolidated with the Underlying Litigation.

This motion was denied on June 25, 2009. The court noted "that either: (1) the Murray Parties decided not to proceed with Count VI of their original counterclaims after consolidation of the two cases; or (2) the Murray Parties forgot about the claim." UL dkt. no. 555. The Murrays argue that they constantly urged PWR to pursue this claim, and in not doing so in a timely manner, PWR committed malpractice.

*7. PWR's Failure to Appeal the Order Denying the Murrays' Motion for Advancement of Fees*

Pursuant to Services' Operative Agreement, Mr. Murray argued that it was required to advance him legal fees and expenses that he incurred in the underlying lawsuit. The court disagreed, noting that the "Operating Agreement did not require Conseco Services to indemnify Plaintiff for acts performed by Murray in his personal capacity." UL dkt. no. 477. Mr. Murray wanted to appeal this order, but asserts that PWR failed to do so, realizing too late that the time for so doing had passed.

*8. PWR's Breach of Duty of Loyalty Regarding "the Trust"*

Prior to the Underlying Litigation, Mr. Murray instructed his son to create the Margaret Murray Trust No. 2 ("the Trust") for the benefit of his wife. Pursuant to the Trust agreement, all distributions from Mr. Murray's law firm, Murray & Murray, went into the Trust. The Murrays

admit that the purpose of setting up the Trust was "to, hopefully, legally segregate those future monies from the exposure of any future litigation." Murrays' Br. at 27. During the course of the Underlying Litigation, Conseco and Services sent a set of interrogatories to the Murrays that asked, in relevant part, for information regarding the creation of any trusts and transfers of monies. Despite its existence, the Murrays' response did not identify the Trust or the resulting distributions. Later, Mr. Murray would claim that he did not disclose the Trust because he believed that he did not "create" the Trust; rather, he claimed his son did.

Thereafter, discovery ensued. As part of the discovery process, numerous documents from the Murrays' accounting firm, Skoda Minotti, were produced. Mr. Murray specifically requested that PWR review all discovery before it was produced to Conseco. PWR informed Mr. Murray that it did so; however, it now admits that it did not. Included in these documents were references to the Trust and the resulting distributions. As such, Conseco and Services filed a motion for sanctions due to the misleading interrogatory responses.

What followed is disputed. The Murrays claim that PWR knew about the Trust from the outset of its representation; PWR, however, represented to the magistrate judge assigned to the Underlying Litigation that it had no knowledge of the Trust until Skoda Minotti produced the Murrays' tax returns. Regardless, the motion for sanctions was eventually granted. As a result, the Murrays were ordered to pay over $85,000 in attorneys' fees to Conseco and Services' lawyers, and the court further ordered that the facts regarding the Trust were to be treated as established for the purposes of the Underlying Litigation. The Murrays claim that this ruling was what spurred them to settle their claim in the Underlying Litigation, and that PWR placed its own interests ahead of that of the Murrays when arguing the sanctions motion.

## II.   DISCUSSION

As noted above, PWR asserted one claim against the Murrays, and the Murrays have asserted a claim for legal malpractice against PWR.  PWR moves for summary judgment on its claim for attorneys' fees and the Murrays' legal malpractice claim.  The Murrays seek summary judgment on their malpractice claim relating to the conflict of interest and federal jurisdiction allegations; they seek partial summary judgment on the rest of their allegations, save their allegation arising out of PWR's failure to take depositions, which they simply oppose PWR's motion for summary judgment.  The Murrays also oppose PWR's motion for summary judgment on its claim for attorneys' fees, arguing that it is "premature."

### A.  Applicable Law

As an initial matter, the Court notes that it will apply Indiana law to this case.  Neither PWR nor the Murrays include a choice of law analysis in their briefs; rather, they all cite to Indiana law.  In light of this, the Court presumes that the parties are in agreement that Indiana law controls. *See ECHO, Inc. v. Whitson Co.*, 52 F.3d 702, 707 (7th Cir. 1995) (noting that the court should apply the forum state's law in the absence of any argument to the contrary).  The Seventh Circuit has stated that "federal courts ordinarily take a nonoverruled decision of the highest court of the state whose law governs a controversy by virtue of the applicable choice of law rule to be conclusive on the law of the state." *See MindGames, Inc. v. W. Publ'g Co., Inc.*, 218 F.3d 652, 655 (7th Cir. 2000).  This works as a presumption, not a rule, which requires federal courts to "predict how the state's highest court would decide the case, and decide it the same way." *Id.* at 655-56.

## B. Indiana's Legal Malpractice Standard

In Indiana, in order "[t]o prove a legal malpractice claim, a plaintiff must establish: 1) employment of the attorney (duty); 2) failure of the attorney to exercise ordinary skill and knowledge (breach); 3) proximate cause (causation); and 4) loss to the plaintiff (damages)." *Flatow v. Ingalls*, 932 N.E.2d 726, 729 (Ind. Ct. App. 2010) (citing *Thayer v. Vaughan*, 798 N.E.2d 249, 255 (Ind. Ct. App. 2003)). As noted above, the Murrays allege eight separate instances of legal malpractice; however, before the Court delves into the specific allegations the Murrays make against PWR, the Court needs to address the issue of causation.

## C. How Must the Murrays Prove Causation?

Both parties acknowledge that causation is an essential element that must be proven in a legal malpractice case; nevertheless, the parties disagree as to *how* causation must be proven. PWR argues that in Indiana, plaintiffs in a legal malpractice case must prove causation by showing that but-for the attorney's negligence, the outcome of the Underlying Litigation would have been more favorable. *See Beal v. Blinn*, 9 N.E.3d 694, 700 (Ind. Ct. App. 2014) ("To establish causation and the extent of harm in a legal malpractice case, the client must show that the outcome of the Underlying Litigation would have been more favorable but for the attorney's negligence.") (citing *Sleweon v. Burke, Murphy, Constanza & Cuppy*, 712 N.E.2d 517, 520 (Ind. Ct. App.1999)). PWR further argues that this must be shown by using the "case within a case" method (also known as the "trial within a trial" method). *See Thayer*, 798 N.E.2d at 255 ("This proof generally requires a trial within a trial.") (internal quotation marks omitted).

The Murrays disagree. They note the difficulty of proving this and the unfairness that results when plaintiffs cannot satisfy the high burden. Therefore, they argue that there are other ways in which plaintiffs can prove causation in a legal malpractice case. *See* Murrays' Reply at

12 ("[P]roof of the ability to obtain a better result in the Underlying Litigation is not the *only* method by which the Murrays can prove damages arising out of PWR's breaches."). Specifically, in their Reply, they delineate three alternative methods of proving causation: "(1) claims which the Murrays lost the opportunity to litigate as a result of PWR's breaches; (2) claims for which PWR's breaches resulted in increased, unnecessary, or inappropriate fees to the Murrays; and (3) claims which were made more difficult to prove as a direct result of PWR's breaches." *Id.* at 13. The Court thus turns to these alternative methods of proving causation.

### 1. Loss of Chance Doctrine

The Murrays pull their "loss of chance" doctrine from the Restatement (Third) of Law Governing Law § 53 which, in comment b, provides the following:

> Similarly, in appropriate circumstances, a plaintiff who can establish that the negligence or fiduciary breach of the plaintiff's former lawyer deprived the plaintiff of a substantial chance of prevailing and that, due to that misconduct, the results of a previous trial cannot be reconstructed, *may recover for the loss of that chance* in jurisdictions recognizing such a theory of recovery in professional-malpractice cases generally.

*Id.* (emphasis added). Thus, for those claims that the Murrays allege PWR failed to bring and/or assert, i.e. their claim for breach of fiduciary duty, the Murrays argue that they can satisfy the causation element simply by proving "that PWR's breaches denied them the opportunity to pursue their claims." Murrays' Reply at 15.

The Murrays admit that *no* Indiana court has addressed this method of causation with respect to legal malpractice cases; nevertheless, they ask this Court to adopt the doctrine. They cite to a few other jurisdictions that, they claim, have adopted the loss of chance doctrine in legal malpractice cases.[6] Regardless of what these cases say, however, this Court's role is to "take

---

[6] The cases cited by the Murrays are not as helpful as they likely desire. For example, *Singleton v. Stegall* simply noted that the pro se plaintiff—the criminal defendant in the underlying litigation—had stated a claim for relief, and that the court of appeals erred in

state law as it is rather than predicting novel developments." *Knight v. Enbridge Pipelines (FSP) L.L.C.*, --F.3d--, 2014 WL 3489345 (7th Cir. 2014) (citing *Prime Eagle Group Ltd. v. Steel Dynamics, Inc.*, 614 F.3d 375, 379 (7th Cir. 2010)). As is, Indiana law simply does not allow the Murrays to satisfy the causation factor simply by showing that PWR's negligence resulted in a lost opportunity. This is reason enough to reject the Murrays' argument. Nevertheless, the Court will briefly address the doctrine itself.

The loss of chance doctrine has recently been applied in medical malpractice cases in several jurisdictions. "The pure loss of chance doctrine compensates for the loss of the chance itself and not for the plaintiff's physical injury[.]" *Wolfe v. Estate of Custer ex rel. Custer*, 867 N.E.2d 589, 601 n.6 (Ind. Ct. App. 2007) (internal citations and quotation marks omitted). The Indiana Supreme Court addressed the applicability of the loss of chance doctrine in medical malpractice cases in *Mayhue v. Sparkman*, 653 N.E.2d 1384, 1388-89 (Ind. 1995).

*Mayhue* was a medical malpractice case brought by Mr. Sparkman against his wife's doctor, Dr. Mayhue. Unfortunately, Dr. Mayhue did not diagnose Mrs. Sparkman's ovarian

_____

dismissing the complaint on its face; it never reached the merits of his claim. 580 So. 2d 1242, 1246 (Miss. 1991). The Supreme Court of Mississippi noted, however, that because the plaintiff did not allege that but for his attorney's negligence he would not have been convicted, his claim could not prevail "for our cases suggest in fairly absolute 'but for' terms that a legal malpractice plaintiff must make these showings." *Id*. Similarly, while the court in *Green v. Rice* noted that "[t]o establish a *prima facie* case in a legal malpractice claim, the plaintiff must prove that negligence on the part of his former attorney caused the loss of opportunity resulting in the inference of causation and damages from that lost opportunity," it went on to note that "once negligence has been proven, the former attorney can overcome the *prima facie* case if he can prove that the former client could not have succeeded on the original claim." *Green v. Rice*, 948 So. 2d 376, 377-78 (La. Ct. App. 2007). The Murrays fail to acknowledge this second sentence. Finally, *Krahn v. Kinney*—cited by the Indiana Court of Appeals in *Silvers v. Brodeur*, 682 N.E.2d 811 (Ind. Ct. App. 1997) for the following holding—held that "a plaintiff need not allege a reversal of his or her conviction in order to state a cause of action for legal malpractice *arising from representation in a criminal proceeding*." *Krahn v. Kinney*, 538 N.E.2d 1058, 1061 (Ohio 1989) (emphasis added). As the Underlying Litigation in the Murrays' case was not a criminal proceeding, this holding is unhelpful.

cancer before it spread to her other organs; Mrs. Sparkman later died, and Mr. Sparkman sued

Dr. Mayhue. Dr. Mayhue's argument during the course of the litigation was that even if he had

diagnosed Mrs. Sparkman's cancer at an earlier time, "Mrs. Sparkman had a less than 50 percent

chance of recovery." *Id*. at 1386. Thus, he argued that "it was not possible that his negligence

was the proximate cause of Mrs. Sparkman's death." *Id*.

Understandably bothered by this result, the Indiana Supreme Court "established an

alternative means of proving causation where traditional means are inadequate and reflects a

special concern for plaintiffs who stood a fifty percent or worse chance of recovering before

suffering some form of medical negligence." *Robertson v. B.O.*, 977 N.E.2d 341, 346 (Ind.

2012). *Mayhue* did not adopt a pure loss of chance theory; rather, it adopted the Restatement

(Second) of Torts section 323(a) standard: "[o]ne . . . is subject to liability to the other for

physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

his failure to exercise such care increases the risk of such harm[.]" *Mayhue* held that once a

medical malpractice plaintiff proves the defendant's negligence and an increase in the risk of

harm, a jury should decide whether the negligence was a substantial factor in causing the harm

suffered by the plaintiff; this was a departure from the typical method of proving causation in

these cases—that but for a doctor's negligence, the plaintiff would have survived. Courts have

since noted that the standard announced in *Mayhue* is only applicable in a narrow subset of

medical malpractice cases. *See, e.g.*, *Laycock v. Sliwkowski*, --N.E.3d--, 2014 WL 3621018 (Ind.

Ct. App. July 23, 2014) ("Thus, it is clear that our supreme court intended for *Mayhue* to alter the

standard of causation only in cases where a patient has a fifty percent or worse chance of

recovering, not in all cases in which a plaintiff alleges an increased risk of harm."); *Indiana

Dep't of Ins. v. Everhart*, 960 N.E.2d 129, 134 (Ind. 2012) ("Other courts that based their loss-

of-chance doctrines on Section 323 likewise made clear that their purpose in adopting a loss-of-chance doctrine was to ensure that patients with a fifty-percent or worse chance of recovering would still receive the same care as healthier patients by preventing physicians from claiming a blanket release from liability under the label of cause-in-fact.").

While *Mayhue* has been read as developing a new method of causation in medical malpractice cases, *Alexander v. Scheid* addressed the question of whether the "loss of chance" itself was compensable as an injury in medical malpractice cases. 726 N.E.2d 272, 279 (Ind. 2000) ("[H]ere the issue is whether a reduced chance of survival . . . is itself a compensable injury."). In *Alexander*, Mrs. Alexander sought as damages a "decreased chance for long-term survival" as a result of the defendants' negligence. *Id*. at 274. The Indiana Supreme Court explained:

> Causation and injury are sometimes described together as the collective third element of a medical malpractice claim. . . . Causation and injury are distinct, however, and we are confronted with this distinction here.
>
> We think that loss of chance is better understood as a description of the injury than as either a term for a separate cause of action or a surrogate for the causation element of a negligence claim. If a plaintiff seeks recovery specifically for what the plaintiff alleges the doctor to have caused, i.e., a decrease in the patient's probability of recovery, rather than for the ultimate outcome, causation is no longer debatable. Rather, the problem becomes one of identification and valuation or quantification of that injury.

*Id*. at 279. In finding that the plaintiff had produced evidence of this injury, the court noted that she

> has pointed to evidence that would support a finding of both present injury and increased risk of harm. We agree with the authorities that find these sufficient to maintain a cause of action for an increased risk of harm. JoAnn has characterized defendants' actions as having reduced her chance for long-term survival and extinguished the chance for successful removal of her tumor. The doctors testified that JoAnn's chances of complete recovery, sixty to eighty percent in June of 1993, had dropped to a ten to thirty percent chance of surviving five years

by May of 1994 [as a result of the doctor's negligence in not diagnosing her cancer earlier].

*Id*. at 281. Because Mrs. Alexander could specifically show that she lost a chance at a better survival rate, her case proceeded.

The Court thus turns to the applicability of the loss of chance doctrine to this case, ultimately concluding that it does not apply. Allowing the Murrays to proceed under a loss of chance theory in this case presents a vast array of issues. First, as noted above, this Court is hesitant to allow a new method of causation—that has never been adopted in Indiana—in a case brought pursuant to Indiana law. Indeed, there are sound reasons *not* to adopt the loss of chance doctrine in legal malpractice cases. For example, this court has noted that "recognition of a loss of chance doctrine is more compelling where the law is compensating the loss of a chance at life, rather than the loss of a chance at, as here, some purely economic gain." *Wright v. St. Mary's Med. Ctr. of Evansville, Inc.*, 59 F. Supp. 2d 794, 803 (S.D. Ind. 1999).

Moreover, many courts have noted the problem with valuation. *See, e.g.*, *Alexander v. Scheid*, 726 N.E.2d 272, 278 (Ind. 2000) ("If a lost chance is to be compensable, its valuation also presents issues."); *Alberts v. Schultz*, 975 P.2d 1279, 1284 (N.M. 1999) ("Because the issues raised in lost-chance actions are, in virtually every case, 'beyond the province of lay persons,' the plaintiff will almost always establish these elements through expert testimony.") (quoting *Pfiffner v. Correa*, 643 So.2d 1228, 1234 (La. 1994)). For example, in addressing this doctrine in a legal malpractice case, the Wyoming Supreme Court noted that the plaintiff had "not designated an expert to testify as to the basis for quantifying the percentage chance that may have been lost by the Firm's alleged malpractice. Without such testimony, any recovery would be based on the type of speculation and conjecture we do not permit as a basis for damages."

*Rivers v. Moore, Myers & Garland, LLC*, 236 P.3d 284, 293-94 (Wyo. 2010).  Similarly, the

Oregon Supreme Court noted the following:

> In our view, the loss of chance doctrine should not be imported into the legal
> malpractice context.  Whatever the merits in the medical malpractice context,
> where the proof burden facing some plaintiffs otherwise would be insurmountable
> and where statistical evidence that can fill the void is readily available, the
> argument for its application in the legal malpractice context is less compelling[.]

*Drollinger v. Mallon*, 260 P.3d 482, 491 (Or. 2011).  As these courts have noted, expert

testimony is necessary to place a value on the loss of chance itself.  However, the Murrays have

provided no expert testimony, and the time for doing so has passed.  Rather, they argue that "[i]t

is up to a jury to determine the value of that lost opportunity." Murrays' Reply at 28.  Even if

loss of chance were a viable option for the Murrays, the Court would not allow the claim to

proceed to the jury—without any expert testimony—to calculate damages.  The value of certain

lost opportunities is not within the ordinary knowledge of a layperson; indeed, the Court

surmises that any value assessed on such a "lost opportunity" would certainly be arbitrary.

Because it is not the role of this Court to extend Indiana's legal malpractice

jurisprudence—and because the Court believes it is not wise to do so—the Murrays will not be

allowed to prove causation simply by showing PWR's negligence caused them to lose a chance

to assert a claim. *See, e.g.*, *Young-Hatten v. Taylor*, No. 08AP-511, 2009 WL 690165, at *8

(Ohio Ct. App. March 17, 2009) ("We discern from the Supreme Court of Ohio[] . . . that it

would . . . not accept appellants' proposition that a 'lost opportunity' case should be subject to a

different standard of proof of causation and damages than a 'better result' case.  . . . Thus, we

conclude that the trial court correctly instructed the jury that appellants were required to prove,

by a preponderance of the evidence, that, but for appellee's alleged negligence, they would have

prevailed in their claim [that their attorney failed to assert].").

## 2. *Increased, Unnecessary, or Inappropriate Legal Fees*[7]

Next, the Murrays argue that for several claims, they "incurred additional or unnecessary legal fees as a direct and proximate result of PWR's breaches of duty." Murrays' Reply at 16. The Murrays do not claim that the outcome of the litigation would have been different had PWR not been negligent; rather, they argue that PWR's alleged negligence caused them to pay more money. In other words, they argue that they "have [] sustained damage or loss regardless of the fact that they may be unable to prove that they would have been successful in the underlying matter(s) in question." *Vahila v. Hall*, 674 N.E.2d 1164, 1169 (Ohio 1997). The Court agrees that, at least for some of the Murrays' claims, this may be sufficient to satisfy the element of proximate cause; indeed, PWR does not directly dispute this fact.

## 3. *Claims Made More Difficult by PWR's Negligence*

Finally, the Murrays argue that "[t]he fact that their claims were made more difficult to prove as a direct and proximate result of PWR's failure to assert them is, by itself, sufficient to prove causation." Murrays' Reply at 20. They glean this theory from two sources. The first is the Restatement comment b, cited above, which provides, in relevant part, that:

> the plaintiff bears the burden the plaintiff would have borne in the original trial; in considering whether the plaintiff has carried that burden, however, the trier of fact may consider whether the defendant lawyer's misconduct has made it more difficult for the plaintiff to prove what would have been the result in the original trial.

Restatement (Third) of Law Governing Law § 53, cmt. b (2000). The Court disagrees with the Murrays' reading of this provision. This does not suggest that a deviation of the "trial within a trial" format is warranted when "an attorney's failures directly impede the client's ability to prove a better result," Murrays' Br. at 90; rather, it just makes clear that the jury is free to take

---

[7] The Murrays also argue that they are entitled to disgorgement of fees for alleged breaches of the duty of loyalty. The Court will address that argument below.

into consideration the fact that the attorney's negligence may have made the plaintiff's burden of proof more difficult. In other words, the Murrays would still have the burden of proving that the outcome of the litigation would have been more favorable but for PWR's alleged negligence; but, if the Court were to adopt this Restatement provision (which has never been cited by an Indiana court), a jury could take into consideration the fact that the negligence may have made it difficult to so do.

Next, the Murrays cite *Vahila v. Hall*, 674 N.E.2d 1164 (Ohio 2007), to support this proposition. In *Vahila*, the Supreme Court of Ohio quoted a law review note that provided the following: "the more negligent the attorney, the more difficult is the plaintiff's task of proving causation." *Id.* at 1169 (quoting *The Standard of Proof of Causation in Legal Malpractice Cases*, 63 Cornell L. Rev. 666, 670-71 (1978)). The Court recognizes this; it is often difficult to prove causation in legal malpractice cases. Nevertheless, it is unclear how the Murrays interpreted this quoted language to support their "automatic causation" argument. The fact that it is difficult to do so does not mean that it is not required.

Essentially, the Murrays' argument is this: 1) we cannot prove that the Underlying Litigation would have been more favorable if our attorneys were not negligent; 2) this is because our attorneys were negligent; 3) therefore, the Court should find that we have satisfied the causation element. The circular nature of this argument is evident, and the Murrays offer no basis for concluding that the Indiana Supreme Court would adopt such a view. The Murrays will therefore not be allowed to use this method to prove causation.

### D. The Murrays' Legal Malpractice Allegations

With the issue of causation at least somewhat addressed, the Court now turns to the eight alleged instances of legal malpractice committed by PWR.

*1. Conflict of Interest*

The Court begins with PWR's alleged conflict of interest. Both PWR and the Murrays claim they are entitled to summary judgment on this claim. PWR disputes that there was a direct conflict of interest due to PWR's representation of both the Murrays and the plaintiffs in the Russell action. The Murrays, however, claim that they "are entitled to disgorgement of all fees paid to PWR" as a result of the conflict. Murrays' Br. at 80. Professor Tidmarsh, the Murrays' expert, offers the following opinion:

> My first opinion in this case is that PWR failed to adhere to good ethical practices in accepting the representation of Dennis Murray. . . . I do not believe that the conflict was so significant that withdrawal was necessary. But obtaining waivers or consent from all affected clients for the dual representation was.

Tidmarsh Report at 7-9. Leaving this issue aside, however, PWR points out a more fundamental flaw in this claim: "the Murrays are attempting to re-characterize their legal malpractice claim as one for breach of fiduciary duty[.]" PWR's Response at 29. It is true that in Indiana typically disgorgement of fees results when one breaches a fiduciary duty. *See Prime Mortgage USA, Inc. v. Nichols*, 885 N.E.2d 628, 659 (Ind. Ct. App. 2008) ("[W]e have previously held that one breaching a fiduciary duty may be required to disgorge all compensation received during the breach.") (citing *Wenzel v. Hopper & Galliher, P.C.*, 830 N.E.2d 996, 1001 (Ind. Ct. App. 2005)). But, as PWR notes, the Murrays did not assert a breach of fiduciary duty as a counterclaim.

The Murrays argue that they "were not required to separately plead an independent claim for breach of fiduciary duty." Murrays' Reply at 17. They argue that "Indiana courts have recognized that a claim for legal malpractice encompasses a number of different legal theories, including negligence and breach of fiduciary duty, among others." *Id*. at 16. The cases the

Murrays cite do not provide the support they need.[8]  For instance, in *Sanders v. Townsend*, the

plaintiffs' complaint alleged *both* claims for negligence and constructive fraud. 582 N.E.2d 355,

358-59 (Ind. 1991) (affirming the grant of summary judgment in favor of the attorney because

"the Sanders failed to support the proposition that they were damaged by Townsend's handling

of their case," but noting that the "Sanders' sole remaining contention is that Townsend breached

his fiduciary duties to them by coercing them into a settlement they considered inadequate").

This was also the case in *Shideler v. Dwyer*, 417 N.E.2d 281 (Ind. 1981). *See Whitehouse v.

Quinn*, 477 N.E.2d 270, 273-74 (Ind. 1985) ("In *Shideler* the plaintiff's complaint *contained five

legal theories of recovery* to support a legal malpractice action.  These theories were breach of

contract, negligence, fraud, constructive fraud, and breach of a fiduciary duty.") (emphasis

added).  In other words, the Murrays have not directed the Court to any Indiana legal malpractice

case in which the court read into a complaint a breach of fiduciary duty claim when only

negligence was alleged.

---

[8] The Court notes that the cases cited by the Murrays in support of their conflict of interest claim also involved claims for breaches of fiduciary duty and/or breaches of the duty of loyalty. *See So v. Suchanek*, 670 F.3d 1304, 1307 (D.C. Cir. 2012) ("The district court conducted a bench trial and eventually winnowed the case down to a single claim for breach of fiduciary duty."); *Hendry v. Pelland*, 73 F.3d 397, 402 (D.C. Cir. 1996) ("Because the Hendrys presented evidence that Pelland breached his duty of loyalty . . . , they were entitled to have their fiduciary duty claim for disgorgement of legal fees go to the jury."); *Gregory v. Porter & Hedges, LLP*, 398 S.W.3d 881, 882 (Tex. App. 2013) ("In this case, appellant Martha A. Gregory d/b/a Workzone Technologies ("Workzone") sued appellee Porter & Hedges, LLP ("P & H"), a law firm, for breach of fiduciary duty."); *Rodriguez v. Disner*, 688 F.3d 645, 655 (9th Cir. 2012) (noting that counsel in a class action serves a "fiduciary role for the class, [and that] the district court must consider whether class counsel has properly discharged its duty of loyalty to absent class members"); *Four Winds, LLC v. Smith & DeBonis, LLC*, 854 N.E.2d 70, 75-76 (Ind. Ct. App. 2006) ("Four Winds' argument is that *after* Smith was terminated, Smith engaged in inappropriate, and what Four Winds perceived to be coercive, tactics in an attempt to convince Four Winds not to terminate it, which amounted to a breach of Smith's fiduciary duties to Four Winds.").

It is well-established that "plaintiffs in federal court are not required to plead with precision legal theories or detailed facts." *Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 664 (7th Cir. 2011). However, the Court cannot read into a complaint an allegation that is not there. In their counterclaim, the Murrays allege the following:

> PWR owed a duty to the Murrays and DPM to exercise ordinary skill and knowledge in its representation of them in the litigation. Throughout the course of their representation, PWR repeatedly failed to exercise ordinary skill and knowledge. The Murrays and DPM suffered damages as a direct and proximate result of the negligence of PWR[.]

Dkt. No. 21 ¶¶ 4-6. Completely absent, however, is any allegation of PWR's breach of duty of loyalty or PWR's breach of fiduciary duty—which is entirely different from alleging that PWR breached its duty of care and was therefore negligent. *See Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin*, 717 A.2d 724, 730 (Conn. 1998) ("Professional negligence implicates a duty of care, while breach of a fiduciary duty implicates a duty of loyalty and honesty."); *see also Trousdale v. Henry*, 261 S.W.3d 221, 227-28 (Tex. App. 2008) ("Attorneys may also be held liable for a breach of fiduciary duty, but such a claim requires allegations . . . that go beyond the mere negligence allegations in a malpractice action. If the gist of a client's complaint is that the attorney did not exercise that degree of care, skill, or diligence as attorneys of ordinary skill and knowledge commonly possess, then that complaint should be pursued as a negligence claim, rather than some other claim."). The Court thus agrees with PWR that the Murrays have "proceeded under a claim of legal malpractice from the inception of this case," PWR's Response at 30,[9] and cannot, at this stage in the case, present new legal arguments that were not pled.

---

[9] The Court also notes that the Murrays have conceded that they have not alleged a separate breach of contract theory of recovery. *See* Murrays' Br. at 51.

The Murrays, however, argue that disgorgement of fees "is nothing more that the accepted measure of damages for such a breach." Murrays' Reply at 16. In other words, they argue that they can recover, as damages, full or partial disgorgement of fees if PWR is found to be negligent. In support, they rely on the Restatement (Third) of Law Governing Law section 37:

> A lawyer engaging in clear and serious violation of duty to a client may be required to forfeit some or all of the lawyer's compensation for the matter. Considerations relevant to the question of forfeiture include the gravity and timing of the violation, its willfulness, its effect on the value of the lawyer's work for the client, any other threatened or actual harm to the client, and the adequacy of other remedies.

Assuming for the sake of argument that disgorgement is a proper remedy for breaches of the duty of *care*,[10] i.e. negligence, the Court does not believe that disgorgement of fees would be a proper remedy in this case.

The Murrays acknowledge that disgorgement of fees "is an equitable remedy," meaning that "the amount of fees to be disgorged is an issue to be determined by the Court." Murrays' Reply at 21. The Restatement (Third) of Law Governing Law provides helpful guidance in this regard in the Comments:

> Forfeiture should be proportionate to the seriousness of the offense. . . . Ultimately, the question is one of fairness in view of the seriousness of the lawyer's violation and considering the special duties imposed on lawyers, the gravity, timing, and likely consequences to the client of the lawyer's misbehavior, and the connection between the various services performed by the lawyer.

---

[10] Even the Murrays allege that disgorgement of fees is a remedy for breaches of the duty of *loyalty*. *See* Murrays' Reply at 1 ("For those claims involving the breach of PWR's *duty of loyalty* to the Murrays . . . the proper measure of damages is disgorgement of some or all of the fees paid to PWR[.]") (emphasis added); Murrays' Reply at 16 ("PWR does not challenge the fact that disgorgement of fees is widely recognized as the appropriate measure of damages where a lawyer breaches *the duty of loyalty* owed to a client.") (emphasis added); Murrays' Reply at 21 ("As noted above, disgorgement of fees is the proper measure of damages when attorneys breach their *duty of loyalty* to clients.") (emphasis added).

Restatement (Third) of Law Governing Law § 37, cmts. d, e (2000). With this in mind, the Court turns to the Murrays' arguments in support of disgorgement.

The first alleged conflict the Murrays allege was the dual representation of Mr. Murray in the Underlying Litigation and the plaintiffs in the Russell action. To this end, the Murrays argue that PWR's representation "was materially limited . . . [and] in actual conflict" for three reasons. Murrays' Br. at 62. First, there was a possibility that Mr. Murray was a potential defendant in the Russell action; at the very least, there was a possibility that he would be called as a witness. Second, both the plaintiffs in the Russell action and Mr. Murray were competing for limited resources from Conseco and Services.[11] And finally, PWR's representation of the plaintiffs in the Russell action resulted in a settlement; this settlement led to more litigation—the RLI action—which exposed Mr. Murray to liability.

The Murrays argue that in light of these conflicts, PWR should be automatically disgorged of over $2.7 million in fees. *See* Murrays' Reply at 1-2 ("[T]he proper measure of damages is disgorgement of some or all of the fees paid to PWR, *regardless of the extent of the Murrays' damages* resulting from the breaches.") (emphasis added). The Restatement provision specifically uses the word "proportionate," however, and the harm caused to the Murrays is most certainly a factor the Court must take into consideration in determining if disgorgement is warranted.

In the Court's view, even if the above allegations created a conflict of interest, the Murrays are not entitled to disgorgement of any fees for these presumed conflicts. First, it is undisputed that Mr. Murray never was named as a defendant or a witness in the RLI action.

---

[11] Professor Tidmarsh opined that the fact that there was competition for limited resources, standing alone, did not create a conflict of interest that required disclosure. *See* Tidmarsh Report at 9.

While the Murrays disagree with the "no harm no foul" argument, the Restatement provides an example that stands for this exact proposition: "For example, a lawyer's failure to keep a client's funds segregated in a separate account (see § 44) should not result in forfeiture if the funds are preserved undiminished for the client." Restatement (Third) of Law Governing Law § 37, cmt. d (2000). In other words, despite the fact that the attorney commingled funds—a breach of duty— if the entire amount of the client's money remained unaffected, the "harm" they suffered does not result in disgorgement of fees.

Second, it is unclear how the "limited resources" of Conseco and Services had any effect on the Murrays' claims. At the end of the Underlying Litigation, the Murrays had no claims remaining against Conseco and Services; in other words, they were not entitled to any money from either entity. The fact that at one time Conseco and Services had "limited resources," therefore, was ultimately immaterial to the Underlying Litigation. Finally, the Court does not believe it is appropriate to place the blame on PWR for the RLI action. As PWR notes, it "had no knowledge that RLI would bring a claim against Murray based on the Russell Action." PWR's Response at 44. It would be inequitable to disgorge PWR of fees for this fact.

Professor Tidmarsh opined that PWR should have obtained written consent for the dual representation of the Murrays and the plaintiffs in the Russell action. *See* Tidmarsh Report at 9. While the Court agrees that this may have been the most prudent course of action, in all, the Court does not see any equity in disgorging PWR of $2.7 million in attorney fees for failing to do so.

The Murrays also allege that PWR's representation of them during the RLI action created another conflict of interest. The Murrays summarize this conflict in their Reply as follows:

> The Murrays claimed that the releases Murray provided in the *Conseco Securities* litigation were conditioned on Conseco's agreement to indemnify Murray on the

D&O loans.  The issue before the Court was whether Conseco had consented to Murray's conditions. Murray contended that Conseco had consented to the conditions and Conseco contended that it had not.  This was a critical point in PWR's representation of the Murrays because if the conditions asserted in the releases were enforceable, then Conseco had a duty to indemnify and defend the Murrays for claims arising out of the stock purchase plan.  The Murrays lost this issue in the underlying litigation because the Court found that there was no proof that the conditions stated by Murray in the releases had been accepted by Conseco.  However, during the course of the *RLI* litigation PWR learned (unbeknownst to Murray until revealed through discovery in the present case) that Greg Joseph, the lawyer who had represented both Conseco and Murray in the *Conseco Securities* litigation, had negotiated the actual RLI releases on behalf of both of them.  When PWR learned of this fact, it should have been clear to them that Joseph had personal knowledge as to whether the conditions asserted by Murray were communicated to Conseco by Joseph and were ultimately accepted by Conseco, by knowingly authorizing their use in settling the *Conseco Securities* litigation. (Murray Supp. Decl. ¶ 9).  But PWR, despite promising on multiple instances to depose Joseph, never did so, in large part because going through the formality of taking his deposition would have exposed their involvement as class counsel for the plaintiffs in *Russell.*  In other words, as it had done with regard to the sanctions, PWR put its own interests ahead of those of its clients, this time by failing to seek valuable evidence from Joseph because doing so would have called attention to its role in *Russell.*  So, in order to protect—or at least downplay—its role in *Russell*, PWR avoided conducting necessary discovery of Joseph in *RLI*, discovery which, in turn, would have furthered the Murrays' arguments in the underlying litigation.

Murrays' Reply at 38-39.  The Murrays' expert, Professor Tidmarsh, does not opine as to whether this alleged conduct fell below the standard of care and/or breached a duty PWR owed to the Murrays.  In fact, most of the evidence the Murrays cite to support this claim is Mr. Murray's own declaration.  It is clear to the Court that these allegations are speculative and lack evidentiary support.  The Court does not agree with the Murrays that PWR should be disgorged of fees for this alleged breach.

As noted above, the Murrays had the opportunity to bring a breach of duty of loyalty and/or breach of fiduciary duty claim against PWR; however, they chose to only allege negligence.  Assuming for the sake of argument that the Murrays had alleged such a claim, the Court finds as a matter of law that disgorging PWR of its attorney's fees would not be equitable

nor proportionate to the harm that the Murrays suffered.  Summary judgment is therefore

**GRANTED** in favor of PWR on this claim.

*2. Federal Subject Matter Jurisdiction*

Next, the Court addresses the claim arising out of PWR's alleged failure to properly

assert federal subject matter jurisdiction in the Underlying Litigation.  Both PWR and the

Murrays seek summary judgment on this claim.  As noted above, PWR failed twice to invoke the

district court's jurisdiction in the Underlying Litigation; this resulted in the complaint being

dismissed with prejudice and an appeal to the Seventh Circuit, which reinstated the complaint.

The Murrays seek damages in the amount of the attorneys' fees they unnecessarily had to pay as

a result of PWR's negligence.

> Professor Tidmarsh notes the following with regard to this issue:
>
> The lack of adequate understanding of federal subject-matter jurisdiction fell
> below the standard of care that I would expect of practitioners with the experience
> and caseload of PWR. . . . The expense devoted to pleading and repleading the
> case and then litigating the issue to the Seventh Circuit could have been avoided
> with the command of federal jurisdictional rules that lawyers of the experience
> and sophistication of PWR should possess.

Tidmarsh Report at 9-11.  Not surprisingly, PWR does not dispute this breach of duty; rather, its

argument is focused on the causation element.  PWR argues that it was not its failure to properly

invoke subject matter jurisdiction that proximately caused the Murrays to incur unnecessary fees;

rather, it was the district court's erroneous dismissal of the complaint "with prejudice" that

forced the Murrays to incur the unnecessary fees.

The Murrays disagree.  As Professor Tidmarsh notes, "[PWR] should never have put Mr.

Murray in this position." *Id*. at 11.  They argue that it was precisely PWR's failure to properly

assert jurisdiction twice that caused the "two dismissal rule" to come into play.  In other words, it

was PWR's failure to properly plead federal jurisdiction—i.e. its negligence—that caused the

28

Murrays to pay unnecessary fees. *See, e.g.*, *Krahn*, 538 N.E.2d at 1061 ("We also find that High Spirits [the former client] has stated a cause of action. High Spirits incurred extra attorney fees in rectifying Kinney's [the attorney] failure to appear at the original commission hearing. The injury is not the penalty ultimately imposed by the commission, but the expenses involved in rectifying Kinney's failure."); *Estate of Campbell v. Chaney*, 485 N.W.2d 421, 425 (Wis. Ct. App. 1992) ("The question is whether the defendant's alleged negligence forced the estate to engage in litigation it otherwise would not have had to engage in.").

However, because "causation, and proximate cause in particular, is a question of fact for the jury's determination," a jury will have to decide what proximately cause the Murrays to incur the unnecessary fees. *Correll v. Indiana Dep't of Transp.*, 783 N.E.2d 706, 707 (Ind. Ct. App. 2002). Accordingly, summary judgment is **DENIED** on this claim.

### 3. Failure to Pursue the Fiduciary Duty and Promissory Estoppel Claims

The Court has grouped these two claims together, as they are solely dependent upon the application of the loss of chance doctrine to legal malpractice cases in Indiana. The Murrays claim that they lost the chance to pursue a promissory estoppel claim and a fiduciary duty claim due to PWR's negligence, i.e., its failure to assert them. For both claims, the Murrays claim they can prove causation as follows:

> The issue is not whether the Murrays would have won the [breach of fiduciary duty] claim. The issue is whether the Murrays *lost the opportunity to pursue the claim* because PWR effectively killed it. . . . The *mere loss of opportunity* is sufficient to show that the Murrays were damaged by PWR's breaches [in failing to pursue the promissory estoppel claim]. It is up to a jury to determine the value of that *lost opportunity*.

Murrays' Reply at 24, 28 (emphasis added). As discussed at length, the Court declines to apply the loss of chance doctrine in this case. Accordingly, summary judgment is **GRANTED** in favor of PWR on these two claims.

## 4. Failure to Conduct Certain Discovery, Including Depositions

The Murrays also claim that PWR committed malpractice by failing to conduct certain discovery despite their requests for PWR to do so.  PWR seeks summary judgment on this claim; the Murrays simply oppose summary judgment being granted in favor of PWR.  As an initial matter, the Court notes that it is not entirely clear what depositions the Murrays allege PWR failed to conduct.[12]  Nevertheless, the Court has identified the following people as having not been deposed, despite the Murrays' desires:[13]  Brent Peterson; Scott Young; Dick Beuter; James Adams; Ron Ruhl; Tom Killian; attorneys from Fried Frank; Greg Joseph; Max Bublitz; Eugene Bullis; and Dixie Johnson. *See* Murrays' Br. at 23-25; PWR's Br. at 29.  Further, the Murrays requested that PWR serve third-party subpoenas on PriceWaterhouseCoopers, outside accountants for Conseco and Services, and Conseco of New York.  Again, the Murrays allege that PWR committed malpractice because it failed to do so.

The Court begins with whether failing to do so was a breach of PWR's standard of care, which necessarily leads to whether the Murrays have produced expert testimony on this issue. *See Storey v. Leonas*, 904 N.E.2d 229, 238 (Ind. Ct. App. 2009) ("[E]xpert testimony is usually required in a legal malpractice action to establish the standard of care by which the defendant attorney's conduct is measured.") (internal citations omitted).  With respect to failing to serve certain third-party subpoenas, the Murrays have offered no expert testimony.  However, with regard to failing to take certain depositions, Professor Tidmarsh noted the following:  "Hilbert, Adams, Larkin, Young, and Peterson were not, so far as I could tell, deposed. . . . I am of the

---

[12] This is due to inconsistencies between the Murrays' interrogatory responses, their summary judgment briefs, and the Tidmarsh Report.  The list of people that should have been deposed differs depending on which document the Court examines.

[13] This list may not be exhaustive; Professor Tidmarsh also opined in his expert report that it was an error not to depose Steve Hilbert and James Larkin. Tidmarsh Report at 16.

opinion that failing to obtain depositions of important figures before or in conjunction with the dispositive motions was an error in judgment." Tidmarsh Report at 16.[14]  Professor Tidmarsh did not opine on whether failing to take the other above-mentioned individuals' depositions fell below the standard of care.

Nevertheless, the Murrays argue that the issue here is that:  1) they instructed PWR to take certain depositions and serve certain third-party subpoenas; 2) PWR agreed to do so; and 3) PWR then failed to do so despite the Murrays' requests.  They argue, therefore, that no expert testimony is needed for a jury to conclude that it falls below the standard of care for an attorney to fail to do something that his client instructed him to do. *See Storey*, 904 N.E.2d at 238 (noting that there is an exception to the expert testimony rule "when the question is within the common knowledge of the community as a whole or when an attorney's negligence is so grossly apparent that a layperson would have no difficulty in appraising it").

Assuming, without deciding, that this is true, the Murrays' claim still fails.  They have directed the Court to no evidence whatsoever of how they were specifically injured as a result of these failures.  Rather, they argue the following:  "The issue here is whether PWR agreed to take the depositions, and then failed to do so. . . . That breach entitles the Murrays *to independent damages, regardless of whether they can prove a direct injury as a result*." Murrays' Br. at 90 (emphasis added).  The Murrays have failed to direct the Court to any case in Indiana that has so

---

[14] The Court notes that in Professor Tidmarsh's deposition, he backtracks on this opinion a bit:

> Q:     So is it premature without hearing that strategic thinking [for why PWR failed to take certain depositions] for you to reach an opinion that it was a breach of the standard of care?
>
> A:     Yeah, I think that's right.

Tidmarsh Dep. at 249: 8-11.

held and allowed that type of esoteric injury to suffice in a legal malpractice claim. If PWR breached a duty owed to the Murrays in failing to follow their instructions, but the Murrays were not injured as a result, they simply are not entitled to any amount of damages. Inherent in a negligence—or legal malpractice—claim in Indiana is some sort of injury. The Murrays have failed to direct the Court to anything that suggests the Murrays were injured as a result of these alleged failures; as such, no reasonable jury could conclude that PWR's assumed negligence was the proximate cause of such injury. Accordingly, summary judgment is **GRANTED** in favor of PWR on this claim.

### 5. Document Review and Sanctions

Next, the Murrays assert that PWR's failure to review certain discovery, which led to sanctions being imposed on Mr. Murray, was malpractice. The Murrays claim that they are entitled to partial summary judgment on liability on this claim; PWR argues that it is entitled to summary judgment on this claim.

The Murrays describe this alleged breach as follows:

> PWR breached its duty of loyalty to the Murrays with regard to its handling of Trust No. 2 in two different, but ultimately related ways.[15] First, PWR failed to properly monitor and review the Murrays' discovery responses before producing them to opposing counsel in order to identify and avoid potential discovery disputes, despite its agreement to do so. Second, when a discovery dispute did arise, PWR falsely and underhandedly informed the Court that it had no knowledge of the documents in question, although the evidence is clear that PWR

---

[15] The Court notes that it seems as though there really are two separate assertions here (and only the latter truly alleges a breach of the duty of loyalty): First, PWR fell below the standard of care when it failed to review the discovery documents, as instructed by the Murrays; and second, PWR fell below the standard of care when it falsely denied the existence of the Trust, causing sanctions to be imposed on the Murrays. Simply because PWR may have breached its duty in failing to review discovery, as instructed by the Murrays, does not mean that it lied in its letter to the magistrate judge in the Underlying Litigation. In other words, answering "yes" to the first does not necessitate an answer of "yes" to the second. Nevertheless, because the parties address them together, so will the Court.

was aware of the contents and intent of Trust No. 2 from the inception of their representation of the Murrays.

Murrays' Br. at 98. Again, the Court starts with the standard of care and whether the Murrays have evidence illustrating that PWR fell below that standard.

The Murrays have no expert testimony on either of these two related claims; however, they claim they fall into the above-mentioned exception for when no expert testimony is needed: "when the question is within the common knowledge of the community as a whole or when an attorney's negligence is so grossly apparent that a layperson would have no difficulty in appraising it." *Storey*, 904 N.E.2d at 238. The Murrays argue that they specifically directed PWR to review all documents before they were produced, and that PWR failed to do so, breaching its duty of care. They argue that "[i]t is well within the province of the jury to determine whether the instruction had been given and, if so, whether PWR failed to follow those instructions." Murrays' Br. at 43.

Relying on *Niswander v. Price Waicukauski & Riley, LLC*, PWR argues that the exception does not apply. No. 1:08-cv-1325-WTL-DML, 2011 WL 2604842 (S.D. Ind. June 30, 2011). In *Niswander*, this Court held that "[w]hether . . . the Plaintiffs' attorneys had a duty to review the documents personally before producing them in discovery . . . is simply not something within the knowledge of a layperson." *Id.* at *3. In response, the Murrays distinguish *Niswander*, arguing that they specifically directed PWR to review the documents while the plaintiffs in *Niswander* did not; in other words, this Court in *Niswander* was evaluating an independent duty to review documents, not a client's-directive to do so. *See* Murrays' Reply at 10 ("The jury does not require an expert to know that lawyers should follow their clients' instructions and should not mislead clients into believing they have done so when they have not; the Murrays can succeed on their claim without such testimony."). The Court agrees that the

allegations the Murrays have made are different from those in *Niswander*. Further, it believes that a layperson understands that generally, attorneys have a duty to follow their clients' desires; moreover, the Court also agrees that it is within the knowledge of a layperson to understand that attorneys should not lie to their clients, telling them they did something that, in fact, they did not do.

The same rings true with the Murrays' allegation that PWR falsely denied knowledge of the Trust: "[i]nstead, at a critical juncture in the case, PWR turned on the Murrays, did so without their knowledge, and in so doing, put its own interests ahead of the Murrays' interests, without giving them the opportunity to consult with separate counsel to protect their own interests." Murrays' Reply at 12. Again, the Court believes that it is well within the knowledge of a layperson that attorneys should not lie and falsely implicate their own clients in order to shield themselves from liability. Thus, the Court agrees that no expert testimony is needed on this claim regarding the standard of care.

That said, there is a factual dispute that precludes granting summary judgment on this claim. PWR maintains that it did not lie; it steadfastly maintains that it had no knowledge of the Trust at the outset of the litigation. Thus, when asked by the magistrate judge when it found out about the Trust, it informed her truthfully. Therefore, whether or not PWR breached a duty that caused injury to the Murrays depends on whom the jury believes: Mr. Murray or PWR. Accordingly, neither party is entitled to summary judgment on this issue.[16]

---

[16] As noted above, the Murrays seem to believe that, at least with respect to the sanctions issue, PWR breached its duty of loyalty. As noted above, breaches of the duty of loyalty were not asserted in the Murrays' counterclaim. Because this claim is intertwined with the failure to review discovery claim, however, it survives.

### 6. Bankruptcy

As noted above, the Murrays allege that PWR was negligent in its failure to adequately press certain claims in Conseco's bankruptcy case. PWR seeks summary judgment on this claim; the Murrays seek partial summary judgment on the elements of duty and breach, arguing that the fact finder should decide whether the breach caused the Murrays damages and the extent of those damages.

Professor Tidmarsh provided the following opinion regarding PWR's alleged failures in Conseco's bankruptcy case:

> [T]he materials that I have reviewed do not suggest that Mr. Murray actively pressed his affirmative claim against Conseco in a way that it might have become a non-dischargeable obligation that would have survived Conseco's bankruptcy. . . . Assuming that it was not done, the failure to press the fraud claim against Conseco in bankruptcy was a serious error in professional judgment.

Tidmarsh Report at 13-14. Therefore, the Court will assume that this failure breached PWR's standard of care.

Nevertheless, the Murrays reach a stumbling block with regard to causation. The Murrays have alleged that the failure in the bankruptcy court resulted in a lost opportunity,[17] resulted in the payment of additional and/or unnecessary legal fees to PWR, and has made it more difficult to now prove what would have happened in the bankruptcy court. In light of the above analysis by the Court, only one of these causation methods is viable: additional and/or unnecessary fees. Unfortunately, the Murrays do not explain how they incurred additional and/or unnecessary fees as a result of PWR's failure to assert claims in the bankruptcy. To the

---

[17] The Court notes that while they claim they were solely aggrieved by the lost opportunity, the Court gleans that the Murrays believe the outcome of the Underlying Litigation would have been different had the bankruptcy case been handled differently. *See, e.g.*, Murrays' Br. at 85 ("The failure to properly leverage the Murrays claims in the course of bankruptcy proceedings . . . deprived the Murrays of their best opportunity to succeed or to reach a settlement[.]").

extent that they believe the entire Underlying Litigation would have been avoided as a result of some sort of bankruptcy settlement—and thus, they would have not had to pay for fees incurred in the Underlying Litigation—this is pure speculation. Moreover, that claim is completely dependent on proving that the Underlying Litigation would have been more favorable had certain claims been pressed in the bankruptcy case, something the Murrays admittedly cannot show. Accordingly, summary judgment is **GRANTED** in favor of PWR on this claim.

### 7. Advancement of Fees

As noted above, the Murrays allege that PWR was negligent in failing to appeal an order in the Underlying Litigation that denied Mr. Murray's request for Services to advance him fees. PWR argues that it "concluded in January 2009 [that] an appeal of the Order denying the Motion for Advancement of Fees was not a viable option." PWR's Response at 40. The Murrays disagree, arguing that PWR "ignore[d] the strategic value of pursuing the appeal." Murrays' Reply at 29. The Court will assume, for the purpose of this motion, that PWR breached its standard of care in failing to file a timely appeal.[18]

The Court notes that both the Murrays and PWR fail to acknowledge the correct method of proving causation Indiana applies when addressing a claim for legal malpractice due to an attorney's failure to appeal. When the allegation of legal malpractice is that an attorney failed to appeal a claim, the question is "what [the court of appeals] would have done had the client not missed her chance to appeal because of her attorney's negligence in perfecting the appeal." *Hill v. Bolinger*, 881 N.E.2d 92, 94 (Ind. Ct. App. 2008) (citing *Jones v. Psimos*, 882 F.2d 1277, 1280-82 (7th Cir. 1989) (applying Indiana law)). Indiana courts have specifically noted that

---

[18] PWR correctly points out that the Murrays have no expert testimony on this point. The Court need not address whether such testimony would be necessary, as the Murrays' failure to satisfy the causation element is dispositive of this claim.

"[t]he *loss of a right to appeal . . . is alone insufficient to impose liability on an attorney*. Rather, a party must establish that she had a valid claim in the underlying action that was allegedly mishandled by the defendant attorney." *Id*. (emphasis added).

For example, in *Hill v. Bolinger*, the plaintiff alleged that her attorney negligently failed to file an appeal of a property distribution order after she divorced her husband. The Indiana Court of Appeals thus had to determine whether it would have reversed the property distribution order on appeal in order to determine if the plaintiff had a valid claim for legal malpractice. The court of appeals ultimately found that there was a rational basis for distributing the property the way the lower court did; accordingly, it held that it would not have reversed the lower court had the appeal been filed. Thus, the court noted that the plaintiff failed to establish the causation element.

The issue was the same in *Jones v. Psimos*:

Ms. Jones [the plaintiff] and Mr. Psimos [the attorney] also agree that the determinative issue is the question of causation. Mr. Psimos was clearly hired by Ms. Jones to represent her, and Mr. Psimos, for purposes of argument, accepts that he failed to exercise ordinary skill and knowledge by an attorney when he neglected to file the papers necessary to perfect Ms. Jones' appeal. The question is whether this negligence caused any damage to Ms. Jones. *She quite obviously has lost any rights to further appeal the property distribution entered in the Joneses' divorce case, but that alone is insufficient to impose liability upon Mr. Psimos*. "[A] party must establish that there was a valid claim in the underlying action which was allegedly mishandled by the defendant attorney. In other words, the client must show that the attorney's negligence proximately caused the injury." *National Wrecking Co. v. Spangler, Jennings, Spangler & Dougherty*, 782 F.2d 101, 104 (7th Cir.1986) (applying Indiana law) (citation omitted). . . .

Mr. Psimos claims that summary judgment was properly granted in his favor because Ms. Jones did not have a valid underlying claim. Ms. Jones, on the other hand, disagrees, asserting that if Mr. Psimos had perfected the appeal the Indiana Court of Appeals would have reversed the property distribution order of the trial court. *This is in fact what Ms. Jones would have to prove in the district court if she were to succeed in her attorney malpractice claim*. When analyzing the merits of an attorney malpractice claim, the court must put itself into the role of the court that ought to have reviewed the underlying claim but missed its chance

because of the attorney's negligence in perfecting the appeal. *See* R.E. Mallen & V.B. Levit, *Legal Malpractice* § 583, at 738-40 (2d ed. 1981). We are, as was the district court before us, left with the difficult task of determining what the Indiana appellate court might have done had it had the chance. If it would have reversed in favor of Ms. Jones, then we must reverse the grant of summary judgment by the district court in Mr. Psimos' favor and let Ms. Jones' malpractice claim go forward. *If, on the other hand, the Indiana appellate court would not have reversed the property distribution order, then Ms. Jones has suffered no injury by Mr. Psimos' failure to perfect the appeal* and the district court's award of summary judgment in his favor was proper. Our task, therefore, is to place ourselves in the shoes of an Indiana appellate court.

882 F.2d 1277, 1280-82 (7th Cir. 1989) (emphasis added). Like *Hill*, the Seventh Circuit concluded that the Indiana Court of Appeals would not have reversed the lower court's decision; therefore, Ms. Jones failed to establish the causation element. *Id.* at 1284.

In denying Mr. Murray's motion for advancement of fees, the court in the Underlying Litigation noted the following:

In its Summary Judgment Order, the Court concluded that, among other things, Section 6.3(c) of Conseco Services' Operating Agreement did not require Conseco Services to indemnify Plaintiff for acts performed by Murray in his personal capacity. Dkt. No. 401, at 19 ("[U]nder Section 6.3(c) Conseco Services agreed to indemnify directors only for those acts performed on behalf of Conseco Services."). It follows that Section 6.3(d), which states that Conseco Services "shall" advance "expenses (including legal fees) incurred by [a director] in defending any claim, demand, action, suit or proceeding," is limited to claims, demands, actions, suits, or proceedings stemming from the director's actions performed on behalf of Conseco Services. Plaintiff's arguments to the contrary are not persuasive. Plaintiff's Motion for Order Requiring Advancement of Fees is hereby denied.

UL dkt. no. 477 at 2. The Court believes the Seventh Circuit would have upheld this decision had it been appealed. The Murrays have directed the Court to nothing indicating otherwise; as Conseco and Services argued:

The law is clear that the Conseco Entities are not required to indemnify Mr. Murray for the $99 million he borrowed voluntarily, in his individual capacity, and with the expectation of personal gain. It is axiomatic, therefore, that the Conseco Entities are also not required to advance Mr. Murray litigation expenses for use in disputing his D&O Loan Program liabilities.

UL dkt. no. 397 at 4. Because the Court does not believe that the Seventh Circuit would have reversed the advancement order had it been appealed, the Murrays cannot satisfy the causation element. Accordingly, summary judgment is **GRANTED** in favor of PWR on this issue.

## E. PWR's Claim for Attorney's Fees

Finally, the Court turns to the sole claim PWR asserts against the Murrays. Currently, $127,592.91 is due to PWR as payment for services rendered to the Murrays in the Underlying Litigation. The Murrays do not dispute that this amount is due; rather, they argue that "[t]he successful pursuit of [their] claims would effectively eliminate PWR's claim, either because the amount owed by PWR exceeds PWR's claim or because an order of disgorgement of fees would invalidate PWR's claim." Murrays' Br. at 92. This does not preclude summary judgment being entered in favor of PWR—as PWR notes "[t]here was a contract and the Murrays have breached that contract by choosing not to pay for the legal services [PWR] rendered." PWR's Br. at 68. As such, summary judgment is **GRANTED** in favor of PWR on its sole claim against the Murrays. The Court notes that no final judgment will issue at this time as outstanding claims remain against PWR.

## III. CONCLUSION

For the foregoing reasons, PWR's motion for summary judgment (dkt. no. 99) is **GRANTED IN PART AND DENIED IN PART**. The Murrays' motion for summary judgment (dkt. no. 118) is **DENIED**. The only claims that remain to be tried are the proximate cause issue with regard to the federal subject matter jurisdiction claim and the allegation of malpractice committed by PWR as a result of its alleged failure to review certain documents that led to sanctions being imposed on Mr. Murray.

SO ORDERED: 9/18/14

_William T. Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication